633 So.2d 983 (1994)
SECRETARY OF STATE of the State of Mississippi, Dick Molpus
v.
Karl WIESENBERG and/or Martha Ann Reed, Co-Executrix of the Estate of Karl Wiesenberg, Deceased, and Denis Wiesenberg, Co-Executor of the Estate of Karl Wiesenberg, Deceased, William D. Byrd, City of Biloxi, Harrison County Board of Supervisors, Peoples Bank of Biloxi, and the State of Mississippi.
No. 90-CA-0692.
Supreme Court of Mississippi.
January 27, 1994.
Rehearing Denied March 31, 1994.
*985 Wilson H. Carroll, Sp. Asst. Atty. Gen., Jackson, Margaret A. Bretz, Gulfport, James O. Nelson, II, James M. Hood, III, Sp. Asst. Atty. Gen., Jackson, for appellant.
Ernest G. Taylor, Jr., Bob Arentson, Heber S. Simmons, III, Watkins Ludlam & Stennis, Jackson, Virgil G. Gillespie, Gillespie & Blessey, Betsy E. Walker, Stanton J. Fountain, Jr., Fountain & Walker, Biloxi, W. Joel Blass, Larry L. Lenoir, Mize Blass Lenoir & Laird, David W. Crane, Allen Cobb & Hood, Gulfport, Ronald S. Cochran, L.C. Corban, Jr., Biloxi, for appellee.
*986 Before DAN M. LEE, P.J., and PITTMAN and BANKS, JJ.
PITTMAN, Justice, for the Court:
This is an appeal from the chancery court of Harrison County wherein the appellee William Byrd brought suit to confirm title on waterfront property located south of Highway 90 in the City of Biloxi. The State of Mississippi, Harrison County, City of Biloxi, Peoples Bank of Biloxi, and all other interested parties were made defendants to the suit. Secretary of State Dick Molpus subsequently filed a suit for declaratory relief in Hinds County, seeking to have the Public Trust Tidelands Legislation of 1989 declared unconstitutional. Byrd, through his attorneys, amended his complaint to include a prayer for declaratory relief seeking to have the 1989 Tidelands Legislation declared constitutional.
The Secretary of State filed a motion to stay the Byrd proceedings, but this motion was overruled. However, the chancellor did allow the Secretary of State to intervene in Byrd's suit. One week prior to the scheduled hearing concerning the constitutionality of the 1989 Tidelands Legislation, Carl Wiesenberg, a Pascagoula attorney and interested party, filed a motion to intervene with the court. The chancellor allowed Wiesenberg to file his brief with the court, but he did not allow Wiesenberg to participate in the arguments the following week. The chancellor dismissed Wiesenberg's intervention sua sponte on the same day that he found the 1989 Tidelands Legislation constitutional. Both the Secretary of State and Wiesenberg appeal this ruling.[1]
After considering the complex legal issues at hand, we find the Public Trust Tidelands Legislation of 1989 constitutional, and affirm the use of the July 1, 1973, date as a starting point for the determination of the mean high tide line in developed areas. However, the 1973 point of beginning continues to be subject to the common law of this State pertaining to tidelands, submerged lands, and riparian and littoral rights.

I.
This appeal deals with both individual property rights and the common law doctrine of public trust. At issue is not only the extent of Byrd's parcel of property, but all property on the Mississippi Coast touching the Gulf of Mexico, its inlets, swamps, bayous and streams, which are subject to changing tides. This Court's decision is of great magnitude and the effects long-lasting. Many local practices will be changed and some claimed ownership will be denied. We affirm that the public trust lands have been constant, save for nature's changes. We acknowledge that local custom and practice has changed and that the degree of enforcement and protection of the public trust has varied. It is hoped that the legislative act and this decision will once again announce the public trust so that local practice and custom may accommodate the law and the trust.
In order to fully understand this litigation, the parties need to be identified and their positions outlined. The initial plaintiff, William Byrd, owns a Honda automobile dealership located on property south of Highway 90, bordering the Mississippi Sound. Byrd filed suit in an attempt to confirm title to the property, which would clear the way for his business to be sold. Following the Secretary of State's intervention in this case, Byrd amended his complaint to include the determination of the constitutionality of the 1989 Tidelands Act. Both Byrd and the Secretary of State stipulated that Byrd's title suit would be delayed until the constitutional issue was settled.
This Court now has the task of determining the constitutionality of the Tidelands Act. We must balance the State's interest in protecting the public trust with that of the area landowners' and need of resolving boundary disputes. This continuing uncertainty has long stymied property development and use and financial transactions. Buyers do not want to purchase land with unknown boundaries, but known potential for lawsuits. Likewise, sellers are having trouble listing *987 their property on the market because they are unsure what they could sell.
In response to this uncertainty, as well as the Cinque Bambini Partnership v. State, 491 So.2d 508 (Miss. 1986) and the Phillips Petroleum Co. v. Mississippi, 484 U.S. 469, 108 S.Ct. 791, 98 L.Ed.2d 877, reh. den., 486 U.S. 1018, 108 S.Ct. 1760, 100 L.Ed.2d 221 (1988) decisions, the Legislature enacted legislation establishing a procedure for determining the line of demarcation between the public trust lands and that of private property owners. This legislation, Senate Bill No. 2780, was thereafter codified as § 29-15-1 through § 29-15-23 of Miss. Code Annotated (1990).

II.
Often when attempting to look forward, we must first look backward. The present tidelands issue is one of these instances. Although public trust law can be traced back to Roman times, it first made its appearance in this country with the formation of the original thirteen colonies. When the original colonies decided to unite to form the United States, each state was granted the right to control its waterways. With each new state's addition to the Union, it was extended this same right under what is known as the Equal Footing Doctrine, thereby affording that each new state "be admitted into the Union upon the same footing with the original states in all respects whatever." 3. Stat. 472, 473 (1817). Therefore, when Mississippi entered the Union in 1817, title to the tidelands and navigable waters which had been held by the United States prior to statehood was conveyed to Mississippi in trust and became immediately vested, subject to that trust. Oregon ex rel. State Land Board v. Corvallis Sand and Gravel Co., 429 U.S. 363, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977); Illinois Central Railroad Co. v. Illinois, 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (1892).
Since that time, the common law of this State has adhered to the doctrine of public trust, applying it in both sixteenth section lands as well as tidelands. See Turney v. Marion County Board of Education, 481 So.2d 770 (Miss. 1985); see also State ex rel. Rice v. Stewart, 184 Miss. 202, 184 So. 44 (1938). The only way public trust lands can be disposed of is if it is done pursuant to "a higher public purpose," while at the same time not being detrimental to the general public. Once land is held by the state in trust, properties are committed to the public (purpose) trust and may be alienated from the State only upon the authority of legislative enactment and then only consistent with the public purposes of the trust. Cinque Bambini Partnership v. State, 491 So.2d at 519; State of Mississippi v. Hanson Properties, Inc., 371 So.2d 871, 873 (Miss. 1979); International Paper Co. v. Mississippi State Highway Dept., 271 So.2d 395, 398-99 (Miss. 1973); Treuting v. Bridge and Park Commission of City of Biloxi, 199 So.2d 627 (Miss. 1967).
The question in need of being answered in the present case is whether the 1989 tidelands legislation constitutes "a higher purpose" and whether it even needs to be assessed under such standard. The Secretary of State contends that the Legislature's attempt to define the boundary lines between public trust lands and private lands does not constitute a "higher purpose." On the other hand, Byrd and the State of Mississippi claim that resolving the tidelands uncertainty and its economic effects clearly constitutes a "higher purpose." In an effort to designate this legislation as a "higher purpose," the Legislature included a preamble to the tidelands legislation which can be found in the Editor's Note following Miss. Code Ann. § 29-15-1. These legislative findings of fact are as follows:
SECTION 1. The Legislature finds that certainty and stability of the land titles of riparian and littoral property owners along the banks of the navigable rivers and waterways on the borders and in the interior of the state and along the shores of the tidally affected waters of the state are essential to the economic welfare of the state and to the peace, tranquility and financial security of the many thousands of citizens who own such lands; that a dispute has developed with respect to such lands bordering on tidally affected waters, calling into question titles and legal issues *988 believed secure and determined from the date of statehood; that this dispute has cast a doubt and cloud over the titles to all littoral lands and all riparian lands along the rivers and shorelines of the coastal area to such a degree that land sales are being prevented, business and home purchasing has been made difficult or impossible, industrial financing based on such titles has become unavailable, and homeowners and other owners have been rendered apprehensive as to their security in their ownership. Economic growth and development in the coastal counties are at a virtual standstill, creating a constantly increasing and incalculable loss of dollars to the area as well as the loss of countless new jobs for the average citizens of this state. The Legislature finds that this dispute has already caused extensive harm, is intolerable, and immediate resolution is required and would serve the higher public purpose, in order that public trust tidelands and submerged lands may be utilized through their normal interface with the fast lands in furtherance of all the usual purposes of the trust.
The Legislature recognizes that it serves the interests of all the citizens of the state as well as the interests of each individual area and that when controversies and problems arise between divergent interests it becomes the duty and responsibility of the Legislature to balance these interests and reach equitable solutions which will create the least amount of harm to the individual citizens and the state as a whole. The Legislature finds, in accordance with justice and sound policy, that resolving the problems in the manner herein set out would create far less harm and be of greater benefit to the state and its citizens in terms of preventing economic loss, loss of jobs, loss of development, use and enjoyment of the tidelands and submerged lands, loss of industry and loss of revenue to the state than any benefits which would be derived from any attempt to completely rectify unregulated wetlands use which has occurred in the past, that the amount of damage, harm or loss that has occurred to the lands held in public trust since statehood is negligible compared to the benefit of resolving the problem, that the cost of any other solution is far in excess of the amount of public gain.
Miss. Code Ann. § 29-15-1 (Editor's Note) (1990). The "higher purpose" which the Legislature seeks to achieve is a management plan for the resolution of land disputes, that will more exactly protect the public interest and may additionally bring peace of mind to adjacent private landowners. The legislative action may also spawn economic growth and new development, and encourage tourism, thereby generating funds, some of which may be used for the protection of the tideland areas, all of which the Legislature declares to be a "higher purpose."
This Court has long recognized and we reaffirm tidelands as being part of the public trust. In State ex rel. Rice v. Stewart, 184 Miss. 202, 184 So. 44 (1938), this Court stated the public trust lands included:
the soil, and ... the minerals therein contained, the beds of all its shores, arms and inlets of the sea, wherever the tide ebbs and flows.
184 Miss. at 230, 184 So. at 49. Further, in Rouse v. Saucier's Heirs, 166 Miss. 704, 146 So. 291 (1933), this Court recognized the inland extent of the federal grant in trust as including
title to all land under tidewater, including the spaces between ordinary high and low water marks; . ..
166 Miss. at 713, 146 So. at 292.
Cases involving public trust lands such as tidelands are governed by state law. Cinque Bambini, 491 So.2d at 513; Oregon ex rel. State Land Board v. Corvallis Sand and Gravel Co., 429 U.S. 363, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977). In Cinque Bambini, this Court cited a laundry list of the many public purposes to which this Court has applied to public trust lands and waters, stating:
[O]ver the years those purposes have come to include navigation and transportation, Rouse v. Saucier's Heirs, 166 Miss. 704, 146 So. 291 (1933); Martin v. O'Brien, 34 Miss. 21 (1857); commerce, Rouse v. Saucier's Heirs, 166 Miss. 704, 146 So. 291 (1933); fishing, State ex rel. Rice v. Stewart, *989 184 Miss. 202, 231, 184 So. 44, 50 (1938); bathing, swimming and other recreational activities, Treuting v. Bridge and Park Commission of City of Biloxi, 199 So.2d 627, 632-33 (Miss. 1967); development of mineral resources, Treuting v. Bridge and Park Commission of City of Biloxi, 199 So.2d 627, 633 (Miss. 1967); environmental protection and preservation, Miss. Code Ann. §§ 49-27-3 and -5(a) (Supp. 1985); the enhancement of aquatic, avarian and marine life, sea agriculture and no doubt others. See Marks v. Whitney, 6 Cal.3d 251, 491 P.2d 374, 98 Cal. Rptr. 790 (1971). Suffice it to say that the purposes of the trust have evolved with the needs and sensitivities of the people-and the capacity of trust properties through proper stewardship to serve those needs.
491 So.2d at 512. (Emphasis added). Further, the State from time to time has granted leases to allow private interests to use certain public trust lands. In the pivotal case of Cinque Bambini, this Court held that fee simple title to all lands naturally subject to tidal influence, whether navigable or not, below today's mean high water mark is held by the State of Mississippi in trust. However, lands brought within the ebb and flow of the tide by avulsion or by artificial or nonnatural means are owned by their private titleholders. Id. at 510-11.
In Cinque Bambini, Justice Robertson addressed mean high tide as follows:
The Gulf of Mexico, however, shifts its boundaries far more often-as the tide daily ebbs and flows, or, more precisely, as the waters interact gravitationally with the moon. Established and accepted scientific methods enable us to establish a mean high water mark-frequently referred to as mean high tide. [citations omitted] That mark is not a line observable on the ground, although it may be plotted by surveyors trained in the field. When plotted we confront the geographical reality of a continuous, unbroken line wildly meandering, to be sure, but reaching from Alabama on the east in uninterrupted sequence to Louisiana on the west.
491 So.2d at 514-15.
Both Cinque Bambini and later Phillips Petroleum Co. v. Mississippi, 484 U.S. 469, 108 S.Ct. 791, 98 L.Ed.2d 877 (1988); reh. den., 486 U.S. 1018, 108 S.Ct. 1760, 100 L.Ed.2d 221 (1988), held that property expectations of the petitioners who had occupied and paid taxes on property bordering water feeding into the Jourdan River were not significant enough (not a higher purpose) to warrant overriding the public trust doctrine in order to grant fee simple ownership to the petitioners. This is directly applicable to the present case, since Byrd makes a claim that the occupiers of coastal property have been paying taxes on this disputed land thinking that they were the true owners. In light of the Cinque Bambini and Phillips Petroleum decisions, it seems rather futile to raise this argument again. We must also reiterate that title to tidelands can not be lost by adverse possession, laches, or any other equitable doctrine. Cinque Bambini, 491 So.2d at 521; Phillips Petroleum Co. v. Mississippi, 484 U.S. 469, 484, 108 S.Ct. 791, 799, 98 L.Ed.2d 877, 891 (1988); reh. den., 486 U.S. 1018, 108 S.Ct. 1760, 100 L.Ed.2d 221 (1988); See Miss. Const., Art. IV, § 104; Gibson v. State Land Commissioner, 374 So.2d 212, 216-17 (Miss. 1979); City of Bay St. Louis v. Board of Supervisors of Hancock County, 80 Miss. 364, 371-72, 32 So. 54 (1902).

III.

DOES THE 1989 TIDELANDS LEGISLATION RESULT IN A "DONATION" OF PUBLIC TRUST LAND?
In reviewing the 1989 Tidelands Act, this Court realizes that the legislative enactment is cloaked with a presumption of constitutionality, and in order to rebut this presumption the unconstitutionality must appear beyond reasonable doubt. Mississippi Power Co. v. Goudy, 459 So.2d 257, 263 (Miss. 1984). It is not this Court's duty to look for factual possibilities or scenarios that would create conflict with the statute, thereby rendering the statute unconstitutional. Rather, this Court's duty is to interpret the Act and envision facts and scenarios in which the statute could be held constitutional. Even the Secretary of State conceded during *990 oral arguments that this legislation could easily be declared constitutional, but for the use of the 1973 mean high water line in developed areas.
Not surprisingly, both sides emphasize different views on this Court's standard of review with respect to statutory construction. However, in Aikerson v. State, 274 So.2d 124 (Miss. 1973), this Court said:
It is a general rule in construing statutes this Court will not only interpret the words used, but will consider the purpose and policy which the legislature had in view of enacting the law. The court will then give effect to the intent of the legislature. State Highway Commission v. Coahoma County, 203 Miss. 629, 32 So.2d 555, 37 So.2d 287 (1947).
274 So.2d at 127. The legislative purpose and intent in enacting the tidelands legislation is clearly defined in the Preamble to the legislation. See § 29-15-1, Editor's Note. (1990). Land sales were being prevented; financing was difficult; economic growth and development declined along the coast line; and, area landowners grew increasingly apprehensive about the status of the land titles. Our nation has championed land ownership as being desirable and as a foundation for our free society and strong democracy. Land lines and land titles are truly lines that secure freedom and titles announce democracy. We had a situation along our coastline where the State could at any time lay claim to any portion of land that was in close proximity to the coastline. The uncertainty was intolerable with our understanding of fee ownership and it was unreliable for investment, development, or the peaceful enjoyment of a citizen's property. In most areas the mean high tide line had not been found or determined. There was an increasing probability that the State would act to protect the public interest. The period of laissez faire ended with the adoption of the 1973 coastal wetlands act and the adoption and the implementation of 1978 Sixteenth Section Reform Act.
The Legislature recognized that there needed to be consistent application and equitable enforcement of the public trust across the entire gulf coast from Alabama to Louisiana, including every bay, sand beach or inlet. The intent of the legislation was to finally put to rest the confusion and chaos surrounding Mississippi's shoreline property.
The main thrust of Appellant's challenge to the 1989 Tidelands Legislation appears to be the drawing of the preliminary map. According to the Tidelands Act, the Secretary of State shall prepare a preliminary map depicting the delineation between public and private lands as of the current mean high water line in undeveloped areas, and as of the nearest effective date of the Coastal Wetlands Protection Act in developed areas said Act having an effective date of July 1, 1973. We must note that the Secretary of State does not dispute the use of the current mean high tide line in undeveloped areas. However, he does argue that the use of the 1973 mean high water line in developed areas will result in a "donation" of public trust property. The Secretary of State claims that upland property owners occupying accreted property developed prior to July 1, 1973, will be granted ownership to property formerly held in the public trust since 1817 statehood. The Secretary of State contends that the appropriate date on which to base the preliminary map should be the mean high water line as of the date on which the property was developed, which in many cases would be prior to 1973. In support of his argument, the Secretary of State contends that the cost of determining this mean high water line as of the date of development would be no greater than the cost of determining it as of 1973.
The Secretary of State argues that the end result of this legislation, if adopted, would be a donative transfer of public trust property at the expense of the citizens of this State. He cites Art. IV, § 95 of the Mississippi Constitution, which states:
Section 95. Lands belonging to, or under the control of the state, shall never be donated directly or indirectly, to private corporations or individuals, or to railroad companies. Nor shall such land be sold to corporations or associations for a less price than that for which it is subject to sale to individuals. This, however, shall not prevent the legislature from granting a right *991 of way, not exceeding one hundred feet in width, as a mere easement, to railroads across state land, and the legislature shall never dispose of the land covered by said right of way so long as such easement exists.
Miss. Const. art. IV, § 95 (1890).
Next, the Secretary of State argues that his "discretion" in revising the preliminary map is limited to the comments and documentation received within the sixty days following the publication of the preliminary map, and only to more accurately depict the line of mean high water as of July 1, 1973. Finally, the Secretary of State claims that his interpretation of the Tidelands Act should be given deference, since he is the one charged with its implementation. See L.H. Conard Furniture v. Mississippi State Tax Commission, 160 Miss. 185, 133 So. 652, 655 (1931). Although the interpretation by an agency charged with implementing a statute is often given deference, this deference is not controlling. Id.
The Secretary of State has the responsibility of managing the lands held in public trusts. An agency assigned the task of implementing legislation should be knowledgeable about the subject. In the present case, the Secretary of State possesses both the technical knowledge and the pertinent data that will reflect the true situation and the Secretary can develop facts concerning any artificial accretions that were not done pursuant to legislative enactment and for a higher public purpose.
This Court, like the State of Mississippi's argument in the case sub judice, does not interpret the tidelands legislation as a donation in violation of § 95 of the Mississippi Constitution, but rather as a unified attempt by the Legislature to resolve the discord existing between the State and area landowners. After balancing the rights of the citizens of our State to use and enjoy public trust lands against the needs of the adjoining landowners to resolve this long and plaguing uncertainty, Chancellor Stewart found the tidelands legislation constitutional. In doing so he stated, "while a few may improvidently benefit from the 1989 Tidelands Act, and while a few may be harmed by it, the overall effect of the Act will not be to donate public property to private interests, but will act as a long delayed delineation between public and private interests." An integral cog of this Act is the amount of discretion which the Secretary of State was granted in finalizing the map. Absent this discretion, the Act might not have passed constitutional muster. The Legislature here recognized a pervasive problem, and they acted reasonably and constitutionally to solve the problem by using a constitutional office, the Secretary of State, who is charged with management responsibility in the area of trust lands. The Legislature has followed a consistent, steady and determined path toward better management of public trust lands through the adoption of practical legislation to be administered by the Secretary of State. The Secretary of State can at all times act to protect the public trust.
We concede that basing the mean high water line as of 1973 will not produce a perfect line, but after the Secretary of State incorporates all comments concerning any artificial changes and applies his discretion, the plan will produce a tidelands map that protects the public's interest as well as private ownership and hopefully put to rest the chaos that has plagued this subject matter and this geographical area for many years. The Secretary of State, after mapping, hearing comments and applying discretion, must hold to a minimum, any incidental or accidental public trust land losses. In upholding this legislation, we interpret the use of the July 1, 1973, date as a starting point in ascertaining the mean high water line in developed areas. Contrary to the Secretary of State's interpretation, this date is not a mandatory bench mark. Rather, the preliminary map shall be drawn as it existed on July 1, 1973, and all interested parties, including adjacent landowners, the public, and the Secretary of State, will have sixty days in which to submit comments which may be used to adjust the final map. Any comments indicating the presence of any unauthorized artificial filling on developed properties prior to July 1, 1973, should be reflected on the final map. This means that the Secretary of State may also incorporate his own comments into *992 the final map. This vast discretion gives the Secretary of State a superior voice in finalizing the map.
Section 29-15-7(5) gives affected landowners a six month period in which to negotiate with the Secretary of State to attempt to resolve any conflicts arising from the final map. However, extensions may be granted by the Secretary of State. Miss. Code Ann. § 29-15-7(4) (1990). Those adversely affected persons who are unable to resolve their differences via administrative avenues, may seek judicial relief by filing suit within a three year period following the publication of the final map. Miss. Code Ann. § 29-15-7(6) (1990). After the three year period expires, all claims will be barred. In any action, the State shall have the burden of proof by a preponderance of evidence that any such land is subject to the trust. Miss. Code Ann. § 29-15-7(5) (1990). After the preliminary map is drawn using the mean high water line in developed areas as of July 1, 1973, the burden of proof is on the Secretary of State to show that any artificial accretion occurring prior to July 1, 1973, was not done pursuant to a constitutional legislative enactment and for a higher public purpose.
There is no constraint on the final map to include or exclude any lands which have been artificially filled prior to 1973. However, if a landowner can show that this artificial filling was done pursuant to a legislative act, or for a higher public purpose, the 1973 mean high water line should remain in tact. Following the sixty day comment period, the Secretary of State may "in his discretion" make any revisions. An unconstitutional donation should not survive this process, since the common law of this State pertaining to tidelands, submerged lands, and riparian and littoral rights are to be applied. See Miss. Code Ann. § 29-15-7(2).
Section 29-15-7(2) of the Act recognizes that the public trust tidelands are ambulatory in nature, and that the boundaries will change with the natural conditions. This section explicitly states that the common law doctrines pertaining to tidelands such as natural accretion and reliction continue to be applicable. The owner of water bounded lands is entitled to any accretions, including the gradual deposit of alluvial soil upon margin of water or gradual recession of waters. Cinque Bambini, 491 So.2d at 519. In the alternative, a private landowner may lose title to lands via reliction. Id. "[W]here the forces of nature-gradually and imperceptibly-have operated to expand or enlarge the inland reach of the ebb and flow of the tide, the new tidelands so affected accrete to the trust." Id. at 520. Such will be the case with the new legislation. As the mean high water lines continue to change over time, this change will be reflected by the continuous mapping process as set out by the tidelands legislation.
The rationale for using the 1973 Coastal Wetlands Protection Act as a beginning point is founded both in logic and economics. Prior to 1973, there was no procedure in place for documenting changes in the natural state of tidelands. If this Court were to adopt the Secretary of State's proposed plan of ascertaining the mean high water line as of the date of development of each parcel of developed property, it would prove to be very costly. Furthermore, it appears to be unnecessary. Surely a unified, consistent, and publicly enforced solution is the best solution. In Cinque Bambini, the oil companies involved paid for two expert surveyors to redraw the boundary lines. The onerous task of surveying the mere 2400 acres cost the litigants an astounding 1.5 million dollars. The present case involves over 100 miles of coastline, and if every inlet on the shoreline were to be tracked, the miles would number in the thousands. Each parcel of land and every title owner would be in play and able to sue and be sued, the result being applicable only to the parcel at issue. This State should not require a plan with such a time consuming, inconvenient and expensive undertaking. However, we are in no way intimating that the State should give up title to property simply because the procedure to establish title is costly or slow. There are other legal considerations involved. If the developed areas were to be surveyed as of the date of development, the cost would be enormous. In addition it would create more lawsuits to determine exactly what constitutes development, what precise time did this *993 development occur, who did it and why, and was it somehow authorized. The more efficient method is to determine the tidelands boundaries as of one point in time, therefore making it applicable to everyone at the same time, in the same manner, and with all having a right to be heard.
This legislation was made dependent on the Coastal Wetlands Protection Act of 1973 in order to utilize tideland maps which the Bureau of Marine Resources prepared for use in the preservation of the coastal wetlands. The 1973 Act provided a procedure for documenting changes in the natural state of the public trust tidelands. Appropriate boundaries can be determined using the existing tideland maps, created as a result of the passage of the Coastal Wetlands Protection Act. This alleviates the expense of having to reconstruct the mean high water line as of the development of each parcel of property.
This Court has allowed the transfer of public trust property to private parties when it is incidental to achieving a higher public purpose. In Treuting v. Bridge and Park Commission of City of Biloxi, 199 So.2d 627 (Miss. 1967), we upheld the right to allow submerged lands on Deer Island, an island approximately a quarter-mile off the coast of Biloxi, to be sold by the Park Commission in fee simple. (Though the areas of residences, schools, churches and golf courses never developed, the case did help develop the law of the subject matter before us.). In Treuting, a suit was brought to confirm title to 12.58 acres of land, with accretions, plus 150 acres of submerged lands abounding the western tip of Deer Island. The alleged urgent need of physical space for expansion fueled the desire to develop this area. The Legislature authorized the Park Commission to cooperate with a private corporation in developing this area which when completed, would result in 47% of the developed area being used for public purposes such as two eighteen-hole golf courses, two nine-hole golf courses, beaches, parks, greenbelts, waterways, school, churches, marinas, streets, drainage, and similar facilities. The remaining 53% of the area was to be devoted to residential, commercial and resort development. In allowing the fee simple conveyance of these surface and submerged lands, this Court stated:
Under the particular facts of this case, the chancery court was warranted in concluding that the state could convey to the Park Commission fee simple title to the submerged lands in question, for public purposes and uses for the development of Deer Island. Moreover, the legislature was justified in authorizing sale of these lands, when filled in and developed, to private individuals as an incident to the overall public interest and purpose in accommodating an expanding population, commerce, tourism and recreation. There will be no substantial interference with the original purposes of the trust imposed upon the state in connection with these submerged lands, and the development as authorized by the statutes is consistent with the public trust. Denial of the legislature's power to provide for development of Deer Island in the manner intended by the Park Commission would be inconsistent with the public trust with the state is charged with administering. It would frustrate any practical attempt to put these lands to any meaningful use, public or otherwise.
The sale of individual lots to private owners cannot be separated from the general context of the overall public purposes involved. If the totality of the development promotes the public interest in general, the incidental private ownership of individual lots does not negate the comprehensive public purpose.
199 So.2d at 633. The Treuting Court stated that the developer's dredging of the channel for use as fill for the island in no way harmed the public's right of navigation, swimming, or fishing. In fact, the dredging of the channel bottom would have a positive effect on the channel. Id. at 631.
Like Treuting, upholding this 1989 Tidelands legislation would in no way impede or diminish the public's right of navigation, swimming or fishing. Further, the Legislature and the Secretary of State are charged not only with maintaining title to trust properties in the State's name, but they have a *994 higher duty. This duty being to continuously seek avenues for proper and effective management of the public trust so that there is a return to the public of use, environmental protection and advancement and, in the appropriate areas, a return of economic growth. To stagnantly hold tidelands is not always in the public's best interest, nor is it responsive to the public's trust. This suit is not an attempt by Byrd to lay claim to the water's edge, but is an attempt to ascertain definitive property lines to his property. As Justice Robertson stated in Cinque Bambini, "[t]hough great public interests and neither insignificant nor illegitimate private interests are present and in conflict, this in the end is a title suit." 491 So.2d at 510. The same can be said about the present case. When public policy is cast away, all that is left is simply a title suit. In this instance the title suit effects every landowner abutting on tidelands and every inch of wetlands from Alabama to Louisiana.
Chancellor Stewart's opinion concedes that drawing the preliminary map using the 1973 mean high water line may result in some incidental transfer of public trust property to private landowners. However, he writes that since the tidelands legislation was enacted to serve a "higher purpose," i.e., defining the boundaries between public and private lands as well as stimulating the coast economy, any incidental transfer of land is permissible. In Cinque Bambini, we stated:
Suffice it to say that the purposes of the trust have evolved with the needs and sensitivities of the people-and the capacity of the trust properties through proper stewardship to serve those needs.
491 So.2d at 512; See also Ryals v. Pigott, 580 So.2d 1140, 1150 (Miss. 1990).
Public trust must not be equated to stagnation or nonuse but is indeed subject to our stewardship and may be used to meet changing needs.

IV.

IS THIS LEGISLATION PRIVATE/LOCAL LEGISLATION?
The Secretary of State also argues that this tidelands legislation was enacted for the sole benefit of a few private coastal landowners who had influence in the Legislature. He insinuates that since this legislation deals primarily with the tidelands on the Coast, it will benefit this area while being detrimental to the remaining citizens of the State. He argues that the 1989 tidelands legislation is violative of §§ 87 and 90(u) of the Mississippi Constitution, which state:
Section 87. No Special or local law shall be enacted for the benefit of individuals or corporations, in cases which are or can be provided for by general law, or where the relief sought can be given by any court of this state; nor shall the operation of any general law be suspended by the legislature for the benefit of any individual or private corporation or association, and in all cases where a general law can be made applicable, and would be advantageous, no special law shall be enacted.
Miss. Const. art. IV, § 87 (1890).
Section 90. The legislature shall not pass local, private, or special laws in any of the following enumerated cases, but such matters shall be provided for only by general laws, viz:
(u) Granting any lands under control of the state to any person or corporation.
Miss. Const. art. IV, § 90 (1890).
We have held that it is the substance, rather than the form, which determines whether a law is general or local or private. Toombs v. Sharkey, 140 Miss. 676, 106 So. 273 (1925). In Vardaman v. McBee, 198 Miss 251, 21 So.2d 661 (1945), this Court defined local and private legislation as:
Class legislation, also often called local or private legislation, is legislation limited in operation to certain persons or classes of persons, natural or artificial, or to certain districts of the territory of the State, and statutes which make unreasonable or arbitrary classifications or discriminations violate provisions of Constitutions prohibiting special laws granting any special or exclusive privileges, immunities, or franchises, or passed for the benefit of individuals inconsistent with the general law of *995 the land. 12 C.J. § 885, p. 1128; 16A C.J.S. Constitutional Law § 489.
It is said in Ruling Case Law, `Where a law is broad enough to reach every portion of the state and to embrace within its provision every person or thing distinguished by characteristics sufficiently marked and important to make them clearly a class by themselves, it is not a special or local, but a general, law, even though there may be but one member of the class or one place on which it operates.' [Emphasis added].
Vardaman, 198 Miss. at 260, 21 So.2d at 664 (quoting Toombs, 140 Miss. at 693, 106 So. at 274). See also Lovorn v. Hathorn, 365 So.2d 947, 949 (Miss. 1979); State ex rel. Pair v. Burroughs, 487 So.2d 220, 223 (Miss. 1986).
A law is classified as general when it operates uniformly on all members of a class of persons, places or things requiring legislation peculiar to that class. State ex rel. Jordan v. Gilmer Grocery Co., 156 Miss. 99, 121-22, 125 So. 710, 717 (1930). Although this legislation is geographical in nature, geography alone should not serve to pigeonhole a law as being local or private. Different areas of the State have different needs. Surely, a general State problem, though confined to a specific geographic area, may require and benefit from State action, without that action violating the constitution. A geographic statewide problem is not a prerequisite for a statewide law to be enacted. The mere fact that the northern counties of this State do not have Gulf front tidelands, should not prohibit the Legislature from enacting general laws of general effect which address the needs of the southern-most counties. The present legislation being challenged is general law, attacking a problem of statewide import, and setting out an implementation of public policy and management of public lands through a constitutionally elected public official. Indeed, the public trust is for the benefit of every citizen, statewide. The present legislation is neither local nor private, nor does it benefit one owner over another with a planned or intentional bias. To argue that this is local legislation or legislation to favor a private person over another is ludicrous. Because the tidelands legislation will be applied to all members of the class of persons whose lands border tidelands, it constitutes a general law. Furthermore, because the legislation is an effort to manage and protect the public trust lands, it is a general law.
The Secretary of State also asserts that by donating public trust lands to private parties, the State has violated its duty as trustee. In stating such, the Secretary of State applies the basic principles of trust law. In Hill v. Thompson, 564 So.2d 1 (Miss. 1989), this Court held that the common law rules of private trusts are to be applied to public school lands trust, thereby prohibiting a trustee from giving away or otherwise disposing of the corpus of that trust in derogation of the rights of the beneficiaries. Id. at 6. To donate public trust lands to private citizens for little or no consideration would breach the fiduciary duty owed to the citizens of the State of Mississippi, who are the owners of the corpus. See Tally v. Board of Supervisors, 353 So.2d 774 (Miss. 1978). Even applying basic trust principles to the present situation, as long as the Act is for a "higher public purpose" and results from a legislative enactment, the tidelands legislation can be upheld. Again we note the legislative resolve to deal with varied land problems; the 1973 Coastal Wetlands Act and the 1980 Sixteenth Section Reform Act wherein the Legislature astutely dealt with protection of the public interest in the Sixteenth Section Lands through statutory direction to the Secretary of State and the selling of so-called lieu lands[2]. The 1989 Act for an appropriate establishment of the mean high tide line through the use of this same constitutional officer, the Secretary of State, is an extension of the legislative effort to deal with problems in regard to public land ownership.

V.

IS THIS LEGISLATION UNCONSTITUTIONALLY VAGUE?
The Secretary of State contends that the discretion granted him by § 29-15-7 *996 is ambiguous and unconstitutionally vague, and in direct violation of the Fourteenth Amendment of the United States Constitution and Article 3, § 14 of the Mississippi Constitution. The due process required by the Federal Constitution is the same due process required by the Mississippi Constitution. Mississippi Power Co. v. Goudy, 459 So.2d 257, 275 (Miss. 1984). A statute is not unconstitutionally void for vagueness when an ordinary person of common intelligence upon reading it could understand what was allowed and what was not. Meeks v. Tallahatchie County, 513 So.2d 563, 566 (Miss. 1987).
In the present case, the Legislature granted the Secretary of State discretion in revising the preliminary map following a sixty day comment/documentation period. The procedure set out by the Act explicitly ensures that the affected parties are heard, either through the comment period, administrative negotiations with the Secretary of State, or by seeking judicial remedies within the three year period following publication of the final map. The mere fact that the discretion granted the Secretary of State could be interpreted in different lights, does not automatically render it vague. See United States v. Dunkel, 900 F.2d 105, 108 (7th Cir.1990). The procedure established by the tidelands legislation has a reasonable relation to the governmental purpose of establishing the boundary of public trust lands and as such is not vague.

VI.

DOES THIS LEGISLATION VIOLATE THE SEPARATION OF POWERS AS FOUND IN ARTICLE 1, § 2 OF THE MISSISSIPPI CONSTITUTION?

The Secretary of State's Argument
The Secretary of State, as a member of the executive branch, argues that his actions in preparing the preliminary map infringe upon the powers granted to the legislative branch, in violation of the separation of powers doctrine. He specifically argues that the discretion afforded him in drawing the final boundary map gives him the authority to convey public trust lands which can otherwise only be conveyed by legislative enactment. The applicable section of the Mississippi Constitution reads as follows:
Section 2. No person or collection of persons, being one or belonging to one of these departments, shall exercise any power properly belonging to either of the others. The acceptance of an office in either of said departments shall, of itself, and at once, vacate any and all offices held by the person so accepting in either of the other departments.
Miss. Const. art. I, § 2 (1890).
The State of Mississippi argues that the Secretary of State did not claim a separation of powers violation at the lower court level, and therefore should not be permitted to raise this issue on appeal. See Sanders v. State, 479 So.2d 1097, 1104-05 (Miss. 1985); State v. Cabana Terrace, Inc., 247 Miss. 26, 37-38, 153 So.2d 257, 260-61 (1963). In Howell v. State, 300 So.2d 774 (Miss. 1974), we stated that while the Legislature could not delegate its power to make law, it may delegate the power to determine certain facts. Id. at 779. In the present case, the Secretary of State's discretion is limited to comments and/or documentation submitted within the sixty day period. Any disagreements or discrepancies resulting from the preliminary map can be either negotiated or brought to trial. In Hinds-Rankin Metropolitan Water and Sewer Association v. Mississippi Public Service Commission, 263 So.2d 546 (Miss. 1972), this Court quoted 73 C.J.S. Public Administrative Bodies and Procedure, § 29, pp. 324-25 (1951) as follows:
In determining whether the delegation of power to an administrative body is an unconstitutional grant of legislative power or a proper grant of administrative power, the distinction is between a delegation of power to make the law, which involves a discretion as to what the law shall be, which delegation is void; and the delegation of authority or discretion as to the execution of a law to be exercised under, and in pursuance of, the law, to which delegation no objection can be made.
* * * * * *

*997 [A] statute is complete and validly delegates administrative authority when nothing with respect to a determination of what is the law is left to the administrative agency, and its provisions are sufficiently clear, definite, and certain to enable the agency to know its rights and obligation.
263 So.2d at 552.
This Court in Hinds-Rankin Metropolitan Water and Sewer went on to state that:
[w]here the legislature sufficiently prescribes a policy, standard, or rule for the guidance of the administrative body, or otherwise confines it within reasonably definite limits, authority may be delegated to the administrative body to carry out the legislative purposes in detail, and to exercise administrative power to regulate and control.
Id.
This legislation is analogous to the statutes dealing with the management of the Sixteenth Section trustlands (§ 29-3-1). In Turney v. Marion County Bd. of Educ., 481 So.2d 770 (Miss. 1985), we stated:
The State, as trustee, may not divest itself of its duties. However, the State, by statute, may vest in others the authority to do acts which the trustee cannot practicably be expected to perform. Restatement (Second) of Trusts § 171 (1959). The State, as a matter of practical necessity, manages its sixteenth section trust property through local county boards of education.
* * * * * *
The charge of the statute is that Boards of Education manage the school trust lands "as trust property" and "assure that adequate compensation is received." Even though the State has vested in the local boards of education certain management powers and duties, the State at all times holds the fee as trustee and maintains the authority and responsibility to oversee the management of the trust and to assure that the trust is properly executed.
Id. at 777.
In the present case, the Legislature enacted the tidelands law and delegated to the Secretary of State the administrative duty to implement it. This legislation in no way gives the Secretary of State the power or authority to make laws. Rather it provides that he be used as a tool in the implementation of the Tidelands Act. Therefore, the Secretary of State, as a member of the executive branch, in no way infringed upon the powers granted exclusively to the Legislature.

Wiesenberg's Argument
Wiesenberg challenges the constitutionality of the 1989 Tidelands Act, arguing that it violates the constitutional principles of separation of powers found in Art. 1, § 2, or in the alternative, Art. IV, §§ 144, 159, and 160. He claims that allowing the Secretary of State to draw the preliminary map and use his discretion in revising the map is an encroachment upon the judicial branch. Wiesenberg argues that the Legislature has created an alternative method of quieting title and removing clouds, and that the Secretary of State has in essence assumed the role of both chancellor and Supreme Court Justice. This, however, is not the case. The power which the Legislature granted the Secretary of State is not the power to quiet title or to remove clouds, but the power to establish the boundary or the dividing line between public trust lands and private property.
The Secretary of State is a constitutionally created office and is statutorily responsible for the public trust lands. The boundary line which the Secretary of State will determine is subject to judicial review, since disgruntled land owners have the opportunity to seek adjudication in the courts which will apply both common law and case law interpretations dealing with tidelands.
In State v. Southern Pine Co., 205 Miss. 80, 38 So.2d 442 (1949), this Court found that a statute granting power to the Attorney General for determining the validity of tax sales and striking invalid tax sales from the list of lands sold to the State was constitutional. The statute provided that the striking was binding on the State of Mississippi and had the effect of relinquishing all rights and title which the State had in the property. Id. at 90, 38 So.2d at 445. The Court determined that the statute provided an "easy way *998 to avoid and make unnecessary, indeed improper, a suit cancelling as a cloud, a nonexisting claim of title." Id. at 94, 38 So.2d at 447. This exercise of power did not constitute a judicial function but instead was considered as an exercise of "judicious discretion." Id. at 94, 38 So.2d at 447. See also, Baham v. Vernon, 42 So.2d 141 (La. App. 1949); Harry D. Kantor & Son v. Stone, 203 Miss. 260, 34 So.2d 492 (1948).
Even if the duties delegated to the Secretary of State could be classified as quasi-judicial, they are constitutionally permissible. In Edward Hines Yellow Pine Trustees v. State, 133 Miss. 334, 97 So. 552 (1923), we analyzed the duties granted the Secretary of State in the Pearl River Swamp Land Act. We held that absent a showing of fraud or mistake, it was constitutional for the Secretary of State to select, list and patent lands in conjunction with the implementation of the Act. Further, in Alexander v. State By and Through Allain, 441 So.2d 1329 (Miss. 1983), this Court stated that:
[i]f the encroachment be occasional and thought necessary for efficiency in government, and if the discretion be into an administrative matter with no inherent danger of enlargement, the argument of appellant that efficiency in government requires some overlapping had definite force.
Id. at 1337. Nothing in the present legislation indicates that the Secretary of State will exercise power granted to the judicial branch of government. Therefore, Wiesenberg's argument is without merit.
After considering Wiesenberg's other assignments of error, we find them without merit and choose not to address them.
Throughout this opinion, we have attempted to balance the concerns of the State, recognizing its duty to protect and preserve public trust tidelands with the interests of the coastal land owners and communities. We applaud the Legislature for its attempts to settle this long standing dispute between competing interests. It is our sincere belief that the enactment of the 1989 Tidelands Legislation will aid in establishing guidelines for the delineation and management of tideland properties in the years to come. Although this decision will not result in a "perfect" resolution of the tidelands issue, it nevertheless should result in a just and equitable resolution for all parties concerned. Therefore, we uphold the constitutionality of the tidelands legislation as enumerated in §§ 29-15-1 through 29-15-23 and affirm the chancellor's findings.
AFFIRMED.
HAWKINS, C.J., DAN M. LEE, P.J., and SULLIVAN, BANKS, JAMES L. ROBERTS, Jr. and SMITH, JJ., concur.
McRAE, J., dissents with separate written opinion.
PRATHER, P.J., not participating.
McRAE, Justice, dissenting:
By endorsing the 1989 Tidelands Act as adopted by the legislature, the majority appears to make an expeditious political decision rather than a thoughtful determination of the Act's constitutionality. The Act, as adopted, violates sections 159 and 160 of the Mississippi Constitution of 1890. It removes traditional coastal land disputes from the judiciary branch and places them in the hands of the executive branch. In addition, the Act violates Section 14 of the Mississippi Constitution by denying equal protection to all Mississippi citizens. The Tidelands Act distinguishes the three coastal counties from our state's other seventy-nine counties without affording those citizens proper notice. Since this Court incorrectly holds that the 1989 Tidelands Act is constitutional, one can only hope that the United States Constitution's Fourteenth Amendment, providing equal protection of the law, will correct our errors. For these reasons as well as those set out hereinafter, I dissent.
The Tidelands Act, set forth in Miss. Code Ann. §§ 29-15-1 through 29-15-23 (1990), has spawned two lawsuits now on appeal before this Court. The case sub judice originated in Harrison County, Mississippi, where on June 8, 1990, Chancellor William Stewart found the Tidelands Act constitutional. The second lawsuit on our docket commenced in Jackson County, Mississippi, where on August 28, 1991, Judge Robert H. Oswald held *999 the Act to be unconstitutional. Two such widely divergent views on the constitutionality of the Tidelands Act by two very learned chancellors should have been considered together. However, although they are handed down on the same day, they were not.
Having reviewed the record of both cases, I concur with Judge Oswald's opinion and adopt his views in their entirety as my dissent. Noting that the Act violates a full panoply of Constitutional provisions, Judge Oswald found as follows:
The subject land is located within the area of the Special Management Area Plan adopted by the United States and the State of Mississippi.
II. Plaintiffs filed a motion for declaratory judgment urging constitutional validity of the Public Trust Tidelands Act Section 29-15-1 et. seq. On motion ore tenus, the Secretary of State was permitted to become a party defendant in addition to the State of Mississippi. The Secretary of State filed a motion for summary judgment urging unconstitutionality of said Act for a variety of reasons. This Court finds that it is unconstitutional in that it "... violates Sections 1, 24, 87, 90(u), 95, 133, 159 and 160 of the Mississippi Constitution and amendments V and XIV of the United States Constitution.
1. It violates Section 1 of the Mississippi Constitution, the Separation of Powers Provision, by assigning a judicial function to the executive branch of government.
2. It violates sections 159 and 160 of the Mississippi Constitution, which grant exclusive jurisdiction to Chancery Courts to resolve land disputes, by purporting to vest such authority in the executive branch of government.
3. It violates the due process provisions of Section 134 of the Mississippi Constitution, by failing to provide citizens of 79 counties, while at the same time depriving them of rights in the public trust tidelands.
4. It violates the provisions of Section 24 and 87 of the Mississippi Constitution, by enacting special, local, and private legislation, where the relief sought can be given by any court of this State.
5. It violates the provisions of Section 90(U) and 95 of the Mississippi Constitution, which prohibit granting or donating public property to private persons and corporations.
6. It violates the due process and equal protection provisions of amendments 5 and 14 of the United States Constitution, by failing to provide notice to the citizens of 79 counties of the State of Mississippi, and failing to provide them equal protection with respect to the public trust tidelands.
7. Portions of the act are valid and do survive, apart from those hereby declared to be unconstitutional. The portions of the act hereby declared to be unconstitutional are paragraphs 1, 3, 4, 5 and 6 of Section 29-15-7 of the Mississippi Code of 1972, as amended.
III. As directed by such Act, the Secretary of State prepared a map which attempts to approximate where the mean high tide line was as of 1973. The legal effect of the Act is to disclaim any state ownership outside the lines established on this map. The act disregards the fact that the act of Mississippi being admitted to the union in 1817 constituted a conveyance in trust under the Equal Footing Doctrine by the national government of all lands below mean high tide in 1817 to the people of the then new State of Mississippi. Cinque Bambini [Partnership v. State], 491 So2d 508 (1986).
IV. Neither statutes of limitation nor laches nor estoppel run against Public Trust lands. State v. Hanson Properties, Inc., 371 So2d 871 (1979). Adverse possession of Public Trust lands, therefore, does not ripen into ownership.
V. While all land titles emanated from the sovereign, where tidelands are concerned, not even the sovereign can ignore the public trust and give away tidelands or convey them away for private purposes. The constitution and the conditions of the trust prohibit such.
VI. The lure of the marsh has spawned repeated efforts by private individuals to appropriate for themselves a part of the tidelands. Such efforts have been met by a chain of cases which have uniformly denied the claims and recognized the public trust and public ownership.
*1000 Money v. Wood, 152 Miss. 17, 118 So. 357 (1928)
Rouse v. Sautier [Saucier's] Heirs, 166 Miss. 704, 146 So. 291 (1933)
International Paper Company v. Mississippi State Highway Department, 172 [271] So2d 395 (1972)
State v. Hanson, 371 So2d 871 (1979)
Cinque Bambini Partnership, Carol W. Allen, Lydia Carroll, Hamilton Pet. Co., and Enserch Exploration, Inc. and Phillips Pet. Co. v. State of Mississippi, et al. and Saga Pet. U.S. Inc., 491 So2d 508 (1986)
The line drawn  where the land meets mean high tide  is ambiguous primarily to those who seek to ignore it.
VII. The transition from territory to statehood in 1817 carried with it the public trust status of all tidelands. Any who have dealt with tidelands have done so not only in the face of such commonly known Public Trust but also in the face of the express constitutional declaration of the public interest. We delude only ourselves if we muse that there have been innocent possessors of this Public Trust and that such "innocents", rather than the public, need protecting.
VIII. The legislation in question is predicated on the asserted need to product certainty, yet the Act creates greater uncertainty. Those who live adjacent to tidelands daily observe low and high tides. There is no confusion now nor has there been in the past, for the laws of nature have persistently been at work. One effect of the 1989 Act is to shift to the public the burden to protect itself from loss. Another is to legitimate past usurpation by private individuals of public property where, as here, the map does not follow the mean high tide line of 1990 nor of 1973 nor of 1817. Examining a series of aerial photographs going back to 1942 and personally going upon the property graphically illustrate that the map is inaccurate and attempts to declare water to be land. Significant areas actually below mean high tide are declared by the map to be above mean high tide. In so doing, the map effects a donation of Public Trust lands to private individuals for private purposes and, in the process, violates the Constitution and the Public Trust.
IX. Past legislation and established common law preclude the assumption the legislature intended as a consequence of this Act any of the following:
1. Abrogation by the State of Mississippi of the SMA Plan for the port of Pascagoula, Jackson County, Mississippi. Such a unilateral act by the State not only would jeopardize channel dredging and further development of the industrial Port of Pascagoula but also would discredit the State in its dealings with each of the federal agencies involved.
2. Substantial reduction in the volume of the annual harvest of shrimp, crab and fish in the three coastal counties of Mississippi.
3. Potential loss to the State and the people of the State, of millions of dollars of real estate presently held in trust by the State for the people.
4. Potential loss of a substantial portion of the pollution control mechanism which is inherent in each acre of tidelands. Various public interests are at stake. Uses authorized through port authorities which exist all along the Mississippi Gulf Coast are part of the public interests. These, alone, already represent multi-billion dollar port and industrial investments from which the public benefits. The shrimp, crab and oyster industries are totally dependent upon the existence of tidelands. When the tidelands are gone, there will be no shrimp, crabs or oysters! Mississippi coastal marsh lands, including part of the subject property, which are below mean high tide have significant value:
X. Various public interests are at stake. Uses authorized through port authorities which exist all along the Mississippi Gulf Coast are part of the public interests. These, alone, already represent multi-billion dollar port and industrial investments from which the public benefits. The shrimp, crab and oyster industries are totally dependent upon the existence of tidelands. When the tidelands are gone, there will be no shrimp, crabs or oysters! Mississippi coastal marsh lands, including part of the subject property, which are below mean high tide have significant value:

*1001 1. As the spawning/incubation grounds for shrimp, crab, some fish, and other forms of marine life. 2. For ecological purposes as a purifier of water run-off from uplands as well as other ecological benefits.
2. For ecological purposes as a purifier of water run-off from uplands as well as other ecological benefits.
3. As a buffer to the uplands against storms. Various studies have sought to establish the values of an acre of marsh (tidelands). "The Value of the Tidal Marsh", Guselink, Odum and Pope, Center for Wetland Resources, Louisiana State University, Baton Rouge, LSU-SG-74-03 May 1974,; "Estimating the Economic Value of Wetlands: Principles, Methods and Limitations," Batie and Shabman, Coastal Zone Management Journal, Volume 10, No. 3, 1982; "Economic Values Attributable to Virginia's Coastal Wetlands as Inputs in Oyster Production", Batie and Wilson, Research Division Bulletin 150, Department of Agricultural Economics, Virginia Polytechnic Institute and State University, Blacksburg, Virginia, June 1979.
XI. No universally accepted valuation method has yet emerged, however, all of the studies reflect values per acre ranging from $3,000.00 per acre to $82,000.00 per acre depending on approach, factors, methodology and location. The studies demonstrate multiple natural-state values associated with marsh:
1. Incubation area for shrimp, crab, oyster, some species of fish, and other marine life. Tidal marsh is the first step in the marine life food chain.
2. Buffer of upland against storms
3. Tertiary treatment of run-off waters from upland
4. Oxidization of nitrogen of biological origin to release it as a harmless gas into the atmosphere
5. Sulfate reduction to sulfur and sulfides through the activities of anaerobic muds in tidal marsh
6. As an absorbent of muddy sediments of storm tides
7. Habitat for birds and animals
8. Trapping of muskrat
9. Scenic and recreation purposes.
Recognized by all researchers is the fact that the shrimp and oyster life cycle are dependent upon the existence of extensive marsh lands. Shrimp form part of the food chain for many species of fish.
XII. Values associated with development of marsh land by dredging or filling to create marinas, waterfront lots, and channels vary greatly also.
XIII. Whichever economic evaluation approach is taken, tidal marshlands have significant value and represent a major public asset. The Court takes judicial knowledge of the facts referred to above in paragraphs X, XI, XII, and XIII from common knowledge of such along the Mississippi Gulf Coast and from numerous federal and state publications which are generally accepted as continuing factually correct data and which are in general distribution to the public along the Mississippi Gulf Coast, such publications being identified as listed below:
A. Estimating the Economic Value of Wetlands: Principles, Methods, and Limitations
B. Economic Value of Natural Coastal Wetlands: A Critique
C. Shrimp and An Acre of Marshland
D. The Economics of Wetlands Preservation in Virginia
E. The Value of the Tidal Marsh
F. What value wetlands?
G. A tool for Use in Making Land Management Decisions Involving Tidal Marshlands
H. The Pricing System
I. Suggested Methods for the Monetary Evaluation of Tidal Marshlands in Mississippi
J. Economic Value of Wetlands-Based Recreation
*1002 K. Economic Values Attributable to Virginia's Coastal Wetlands as Inputs in Oyster Production
L. America's Endangered Wetlands
M. Endangered Species (Department of the Interior)
N. Vanishing Gulf Coast Wetlands
O. Conservation of Soil and Water (Jackson County Soil and Water Conservation District)
P. Oystering on the Mississippi Coast (Book IV)
Q. The Wetlands a Student's View
R. It's what you know that counts (Book VII)
S. Mississippi Outdoors (September-October 1990)
T. Restless Ribbons of Sand (Atlantic and Gulf Coastal Barriers)
U. Mississippi Coastal Program
V. Special Management Area Plan for the Port of Pascagoula, Jackson County, Mississippi (SMA Task Force)
The parties acknowledged into the record the propriety of the Court taking judicial notice. They were given an opportunity to be heard as to judicial notice and they agreed with such facts.
XIV. Within the ambit of the state constitution, the State legislature periodically has enacted valid laws which further the public interest in and benefit from tidelands. Among these are:
Jackson County Port Authority Act State Port Act
Mississippi Coastal Wetlands Protection Act
XV. In addition, formal government accords have been created which have the force of law and which also express the determination to protect the public interest in tidelands. Notable in this case is the "Special Management Area Plan for the Port of Pascagoula, Jackson County, Mississippi" (SMA Plan) which preceded this 1989 legislation and which involved joint participation and agreement of:
Jackson County Port Authority
Jackson County Board of Supervisors
Mississippi Bureau of Marine Resources
Mississippi Bureau of Pollution Control
Mississippi Department of Archives and History
US Army Corps of Engineers, Mobile District
US Environmental Protection Agency
US Fish and Wildlife Service
US National Marine Fisheries Service.
XVI. The property involved in this litigation is within the area of such accord. Since the accord is illuminating as to the myriad considerations involving tidelands, the Court attaches to this opinion a copy of the SMA Plan for the Port of Pascagoula, Jackson County, Mississippi.
XVII. Much of the legislation concerning tidelands is complicated, with countless ramifications involving the public interest. The map produced by the present legislation is in disregard of that legislation and of the various accords and specifically is in contradiction of the SMA Plan for the Port of Pascagoula. However well-intended this legislation may be, it represents an approach to a highly complex issue as to which there is no simple approach.
XVIII. The map produced by this legislation purports to define the public ownership of tidelands as of 1973, not 1817. (Why 1973 rather than earlier dates, such as 1942 when aerial photographs of the coast became available is a question which must remain presently unanswered. Most development on the coast has taken place after 1942 and thus would be disclosed by early aerial photographs.) See copy of aerial photographs attached. If the current map approach is valid, a future law could produce yet another map defining public ownership as of 1999 or 2020 or any future date. If the present map is any indication, the likely result would be that each time a new map came along the public ownership would be further reduced.
Over the years, tidelands cases have periodically occurred and been resolved by the courts, much as other property line disputes. Down through the years along the Mississippi Coast, surveyors have routinely established *1003 property lines, including the line, i.e., mean high tide, dividing privately owned uplands from public trust tidelands; and courts in the coast counties have routinely ruled on these issues. Seldom has there been anything Herculean about such cases. The Act violates Sections 24, 87, 159 and 160 of the Mississippi Constitution which vest in the courts the resolution of such disputes.
XIX. To the limited extent to which this Act disclaims public ownership of lands which were below mean high tide as of 1817, as subsequently altered by nature, it is in violation of Sections 90(U) and 95 of the Mississippi constitution of 1890 and is void. All lands which were below high mean tide in 1817 continue to he subject to the Public Trust and subject only to changes wrought by nature and any lawful, constitutional acts of the legislature.
XX. The 1989 Act violates the due process clause of both the state and federal constitutions. Each of Mississippi's citizens has a vested interest, as a member of the public, in the Public Trust tidelands, yet the maps by which final certificates of title are to be issued by the Secretary of State have been placed only in the courthouses in Jackson, Harrison and Hancock counties and not in the other 79 counties. The court takes judicial notice that from Pascagoula to the north end of DeSoto County is over 350 miles. What fair notice and opportunity have citizens in Hernando or Tupelo had to be aware, in the first place, of what is going on, to examine the maps, and to protest if they determined some of the Public Trust tidelands were about to be given to a private owner through a final certificate issued by the Secretary of State? Given the great distances from northern counties in Mississippi to the coast, can 90 days of the maps laying open for public inspection in the three coast counties be a fair and reasonable time for 2 1/2 million citizens/if they wanted to, to examine the maps? Each citizen has the right to be aware of what is going on and a reasonable opportunity to respond. Reasonable does not include traveling 350 miles to look at a map. In this respect, the 1989 Act also ignores and violates the equal protection clause by providing maps in only three of the eighty-two counties.
XXI. The 1989 Act violates the equal protection clause by creating two small special classes to whom public property will be given  those being upland owners where they, or their predecessors, prior to July 1, 1973, trespassed against the Public Trust by filling in tidelands adjacent to their property. This group would be rewarded for their trespass by receiving a final certificate of title from the Secretary of State. The other group would be the upland owners in those instances where the mean high tide line placed on the preliminary map is, in fact, seaward a distance from the present mean high tide line on the ground. By consenting to the lines on the preliminary map, such upland owners would receive from the Secretary of State a final certificate windfall title to lands actually below mean high tide  all because the preliminary map was wrong. With a final certificate, such upland owners could proceed to alter tidelands.
XXII. If the process proposed by this legislation were applied to 16th Section school lands, it would be only a matter of time until most school lands and timber would be lost.
XXIII. Despite the language of the 1989 act, one of its significant effects is to serve private purposes, not public. The substance and effect of a law determine its constitutionality, not words which ignore the effect. Calling water land does not make it so.
XXIV. The inevitable result of the 1989 Act is that, after it is implemented, the Public Trust will be smaller with the public receiving nothing in return. There is no consideration or quid pro quo, just a gift of public property to corporations and private persons for private purposes.
XXV. The 1989 Act undertakes to vest in the executive branch  the Secretary of State  functions which are purely judicial. To such extent, the 1989 Act violates the separation of powers clause of the Mississippi Constitution, Section one. Constitutionally, courts determine boundary line questions. The 1989 act undertakes to establish the Secretary of State to conduct hearings, to take evidence, but with no standards, to make decisions as to property lines, and to declare ownership of titles by issuing a final *1004 certificate, judicial functions all, with no provision for appeal or review.
XXVI. The 1989 act provides that based upon the "preliminary map" the Secretary of State may issue a final certificate to a private owner declaring the state asserts no claim outside the lines drawn on such map. The map itself, however, declares that it is not a survey but is only an estimate or approximation and acknowledges that the actual mean high tide line may, indeed, be at a location other than that estimated on the map. While the upland owner has the right to object, what upland owner is likely to do so where, by accepting the estimated line shown on the map, he might gain, a "final certificate" to land which, in fact, is below mean high tide and which, otherwise, he could never own?
XVII. The 1989 Act makes provisions for an upland owner to object to the preliminary map and outline of the Public Trust tidelands, and gives upland owners an extended three years to object to the final map and file a contrary claim. No such rights are extended to members of the public.
XXVIII. The Court has considered the provisions of the Pat Harrison Waterway legislation, and especially Section 51-15-119 and the federal law there referred to, and has determined that this ruling of the Court is in consonance with such legislation. (emphasis added).
Because I find the Act, as adopted, to be unconstitutional, I disagree with the majority's decision, and only hope that this Court's error can be corrected through the use of the United States Constitution's Fourteenth Amendment, which provides that no state shall deprive its citizens of equal protection of the law. Chancellor Stewart simply stated that the statute, although not perfect, was constitutional. When making the decision to allow the intervention of Karl Wiesenberg's complaint, he was given the opportunity to review all of the constitutional questions that Chancellor Oswald had decided. Unfortunately, Chancellor Stewart later dismissed the complaint sua sponte without addressing or even reviewing the constitutional issues which had been raised. Chancellor Oswald, having taken a closer look at the issues before him, of course found parts of the Act to be unconstitutional. Why did the legislature use the 1976 mean tide line as a boundary when 1946 aerial photographs established the mean tide? Is it because most of the real estate development in the area did not occur until after 1946? Land developers have been rewarded by the legislature for overreaching and developing the tidelands at the expense of our citizens. We must somehow strike a balance between the delicate ecology of the tidelands estuary and the demands of commercial development, or the beauty of our coastline will be destroyed.
Finally, when this Court is presented with two cases where the lower courts have reached conflicting decisions regarding the constitutionality of the same statute, we should not hesitate to consider those cases together and decide them simultaneously. To do otherwise results in often inconsistent results and may prevent the parties in the later case from receiving an equally fair and thorough review. As a result of the majority's decision today, the decision by Chancellor Oswald in State of Mississippi v. Dick Molpus, Secretary of State, Miss. No. 91-CA-0975, (Cause No. 51,580, Jackson County Chancery Court), will probably be rendered moot.[1] Accordingly, I dissent.
NOTES
[1] The case here decided and State v. Molpus, 633 So.2d 1008 (Miss. 1994), have been considered by all Justices with all issues reviewed and there has been a coordinated hand down as there was a coordinated consideration.
[2] Lands granted to a county in lieu of Sixteenth Section Land where title in the Sixteenth Section has been secured by private persons prior to the original grant of Sixteenth Section Lands for public purposes.
[1] This dissent was written in late 1993 before a decision was made in State v. Molpus, 633 So.2d 1008 (Miss. 1994).