# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 97-CA-01290-SCT

### CONSOLIDATED WITH

### NO. 98-CA-00235

*SHARON SELMON SMITH, NATURAL MOTHER OF BRIAN LAMONT SELMON, DECEASED, AND NATURAL MOTHER AND GUARDIAN OF BRANDON LAMAR SCURLARK AND BRITTNEY LASHAUN SMITH, MINORS AND NATURAL SIBLINGS OF BRIAN LAMONT SELMON, DECEASED, AND STEVE SELMON, NATURAL FATHER OF BRIAN LAMONT SELMON, DECEASED, ALL WRONGFUL DEATH BENEFICIARIES OF BRIAN LAMONT SELMON, DECEASED*

*v.*

*DAVID STEVEN BRADEN, M.D.*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/26/1997 |
| TRIAL JUDGE: | HON. JAMES E. GRAVES, JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | L. CHRISTOPHER BREARD |
| ATTORNEYS FOR APPELLEE: | STUART G. KRUGER |
| | C. YORK CRAIG, JR. |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | REVERSED AND REMANDED - 08/24/2000 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 9/15/2000 |

**EN BANC.**

**SMITH, JUSTICE, FOR THE COURT:**

## STATEMENT OF THE CASE

¶1. This appeal comes to this Court from the Circuit Court of Hinds County, Mississippi, First Judicial District, where summary judgment was granted in favor of Dr. David S. Braden upon a finding that Dr. Braden is an employee of the University of Mississippi Medical Center and that the plaintiffs failed to file their action within the one-year statute of limitations provided by Miss. Code Ann. § 11-46-11 (Supp. 1999). We find that at present there is a genuine material issue of fact. Therefore, this case is remanded for additional discovery and application by the trial judge of the five-part test recently adopted by this Court in *Miller v. Meeks*, No. 1999-CA-00210-SCT, 2000 WL 86317 (Miss. June 29, 2000), in determining whether Dr. Braden is an employee or an independent contractor.

## STATEMENT OF FACTS

¶2. Brian Lamont Selmon, age two, died July 13, 1994, subsequent to a cardiac catheterization performed by Dr. David S. Braden at the University of Mississippi Medical Center. Dr. Braden is an Assistant Professor of Pediatrics at the University. Brian's parents, Sharon Selmon Smith and Steve Selmon, brought a negligence suit for damages individually and on behalf of Brian's siblings, against Dr. Braden, University Hospital and Cindy Wilson, R.N. The action was filed in the Circuit Court of Hinds County, Mississippi, First Judicial District, on July 12, 1996.

¶3. The University and Cindy Wilson were subsequently dismissed from the action pursuant to the trial court's finding that the plaintiffs failed to meet the one-year statute of limitations set forth in Miss. Code Ann. § 11-46-11(3) (Supp. 1999). Dr. Braden filed a Motion to Dismiss pursuant to the same rationale, asserting that he is an employee of the University. In his order of March 19, 1997, the trial judge stated that he would take Dr. Braden's motion to dismiss under advisement pending limited discovery on the issue of Dr. Braden's employment status. The trial judge stated that, in addition to outstanding discovery, the plaintiffs would be permitted to propound ten interrogatories to Dr. Braden, ten interrogatories to the University, five requests for production of documents to the University, and five requests for production of documents to Dr. Braden. The plaintiffs were not allowed to take any depositions. The court stated that after such discovery was completed and plaintiffs had presented evidence regarding Dr. Braden's employment status to the court, the court would then determine whether additional discovery should be allowed, including whether the plaintiffs would be allowed to depose Dr. Braden.

¶4. The plaintiffs propounded three sets of interrogatories to Dr. Braden, five sets of requests for production of documents to the University, and four sets of requests for production of documents to Dr. Braden. The plaintiffs also served upon Medical Assurance Company of Mississippi, Dr. Braden's malpractice carrier, a subpoena duces tecum requesting, among other things, all documents relating to Dr. Braden, including Dr. Braden's application for membership, application for insurance, employment status, bills for coverage and notice of any negligence claims. In response to the subpoena, Medical Assurance filed a motion to quash and for a protective order, stating that the trial court should first rule upon Dr. Braden's Motion to Dismiss before considering the appropriateness of the subpoena duces tecum. Dr. Braden filed a motion joining the motion to quash filed by Medical Assurance, claiming attorney-client privilege and the work product doctrine. The plaintiffs filed a response to the motions to quash. These subpoenas were never answered, and the trial court never ruled on the motions.

¶5. The plaintiffs requested at the time of the hearing before the trial court on Dr. Braden's motion to dismiss that they be allowed to pursue production of the subpoenaed documents and to take the depositions of Dr. Braden and other individuals at the University and at Medical Assurance. The request for further discovery was denied. The court treated Dr. Braden's Motion to Dismiss as a Motion for Summary Judgment according to M.R.C.P. 12(b). The court granted summary judgment in favor of Dr. Braden on August 26, 1997. The court found that Dr. Braden is an employee of the University, within the meaning of Miss. Code Ann. § 11-46-1(f), and that the plaintiffs' action is time-barred because it was filed outside the one-year statute of limitations found in Miss. Code Ann. § 11-46-11. The Plaintiffs filed a Motion to Reconsider Dismissal and a Rule 60 Motion for Relief from Judgment or Order and to Reconsider Dismissal. Both motions were denied. Aggrieved, plaintiffs timely filed their Notice of Appeal on September 24, 1997, raising the following issues:

**I. THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF DR. BRADEN AND IN PERMITTING ONLY LIMITED DISCOVERY ON THE**

**ISSUE OF DR. BRADEN'S EMPLOYMENT STATUS.**

**II. THE ACTION IS NOT BARRED BY THE STATUTE OF LIMITATIONS OF MISS. CODE ANN. § 11-46-11(3).**

**III. THE TORT CLAIMS ACT IS UNCONSTITUTIONAL.**

## STANDARD OF REVIEW

¶6. This Court reviews de novo a grant of summary judgment. *Aetna Cas. & Sur. Co. v. Berry*, 669 So. 2d 56, 70 (Miss. 1996). A motion for summary judgment is granted only when the trial court finds that the plaintiff would be unable to prove any facts to support his claim. *Delahoussaye v. Mary Mahoney's, Inc.*, 696 So. 2d 689, 690 (Miss.1997). On appeal, the trial court's decision is reversed only if it appears that triable issues of fact remain when the facts are viewed in the light most favorable to the nonmoving party. *Robinson v. Singing River Hosp. Sys.*, 732 So. 2d 204, 207 (Miss. 1999) (citing *Box v. State Farm Mut. Auto. Ins. Co.*, 692 So. 2d 54, 56 (Miss. 1997)).

## DISCUSSION OF LAW

**I. THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF DR. BRADEN AND IN PERMITTING ONLY LIMITED DISCOVERY ON THE ISSUE OF DR. BRADEN'S EMPLOYMENT STATUS.**

¶7. If Dr. Braden is an employee of the University, he is entitled to the protections of the Tort Claims Act, Miss. Code Ann. § § 11-46-1 et seq. (Supp. 1999). Because this action was filed outside the one-year statute of limitations provided in § 11-46-11(3), a finding that Dr. Braden is an employee of the University would result in the plaintiffs' action being time-barred under the Act. The plaintiffs argue that the trial court erred in finding that Dr. Braden is an employee of the University. The plaintiffs do not dispute that Dr. Braden is an employee of the University in his role as Assistant Professor of Pediatrics, but they argue, that Dr. Braden is not an employee of the University in his practice of medicine. They submit that there exists an issue of material fact as to whether Dr. Braden is strictly an employee, and that, at the very least, they should be allowed to conduct further discovery on the issue.

¶8. Facts pertinent to the employment relationship between Dr. Braden and the University are as follows. Dr. Braden's position at the University is Assistant Professor of Pediatrics. On September 16, 1993, the Board of Trustees of State Institutions of Higher Learning approved Dr. Braden's change in status from Assistant Professor of Pediatrics, School of Medicine, to Assistant Professor of Pediatrics, School of Medicine and Attending Physician, University Hospital. Dr. Braden's salary remained the same despite the change in status. Dr. Braden was informed of this change by interdepartmental memorandum dated September 17, 1993. However, the change in status was not delineated in Dr. Braden's next employment contract, effective July 1, 1994, which states simply that he is Assistant Professor of Pediatrics.

¶9. The contract between the University and Dr. Braden is entitled "Employment Contract," and it refers to Dr. Braden as an "employee" numerous times. Under the contract in force at the time of the alleged negligence, Dr. Braden was to receive an annual salary of $52,770.00.[1] However, the contract also provides that Dr. Braden, in addition to his annual contracted salary, will be permitted to earn additional income from medical practice. Dr. Braden is permitted to retain 100% of the earnings from his practice up to a total income of $140,000. Income in excess of $140,000 is divided fifty/fifty between Dr. Braden and

the University. Dr. Braden is responsible for all billing and collection of income from the patients he treats. The University bills separately for hospital services. Both the University and Dr. Braden have the right to terminate the employment relationship at will. Dr. Braden receives State employee health insurance. He is eligible for State employee retirement benefits. His malpractice insurance is discounted based on his employment at the University.

¶10. Dr. Braden states in his affidavit that his practice at the University differs from the practice of private physicians in that private physicians have admitting privileges at various hospitals and are not employees of those hospitals. Dr. Braden states that he teaches students and treats patients as part of his employment at the University and that patient care is a vehicle for teaching at the University. He states that he does not have a private practice independent of the University. Dr. Braden states that he is prohibited from admitting patients anywhere but at the University and is prohibited from acting as primary treating physician at any hospital besides the University. He states that only University faculty are allowed to admit patients at the University. He states that the University provides his office space and pays the salaries of office support staff, including nurses and catheterization laboratory personnel. He states that the University controls what patients he treats, the number of patients he treats, and does not allow him to refuse to treat a patient or to terminate treatment of a patient. Dr. Braden states that he could not have treated Brian Selmon if Brian had not been a patient of the University, could not have admitted Brian at any hospital but the University, and could not have performed a cardiac catheterization on Brian anywhere but at the University.

¶11. Most of the facts and assertions above point to the existence of a strict employment relationship between Dr. Braden and the University. The facts above which do not demonstrate a strict employment relationship are that it was solely the responsibility of Dr. Braden to bill and collect the income from his treatment of patients and that Dr. Braden was permitted to retain 100% of those remittances up to a specified amount. The clarity of the relationship, however, becomes hazy in light of the partnership entered into by Dr. Braden and other pediatric cardiologists in his department.

¶12. Dr. Braden was a member of a partnership called Children's Cardiac Care Consultants (hereinafter, CCC). CCC was organized on September 1, 1992. Dr. Braden became a partner on November 1, 1993, and remained a partner until the partnership's dissolution on June 30, 1995. The partnership agreement was entered into by Dr. James Joransen, Dr. Charles Gaymes, and Dr. Braden, and eligible for membership upon the approval of all existing partners were new faculty members of pediatric cardiology at the University.

¶13. The agreement states that "the offices of the partnership shall be located at University Medical Center, Division of Pediatric Cardiology . . . ." The partnership agreement expressly gives the partners the right to designate another location for the offices. The agreement states that all three physicians will convey to the partnership all equipment, instruments and supplies currently utilized by the physicians in their "private practices" at the University. The documents state that all income of the physicians derived from their "private practice of the Profession [including, but not limited to, all receipts for professional medical services related to pediatric cardiology, such as interpretation of . . . tests performed by the partners as resident full-time members of the teaching pediatric faculty" at the University "shall become the property of the partnership . . . ." The partnership was to pay "all general business expenses related to the private medical practice of the partners. . . ," including equipment and office supplies. The partnership was to pay each partner a specific amount of remuneration each month. The agreement even contains a non-competition clause which states that if a partner withdraws from the partnership and practices within twenty-five miles of the nearest

boundary of the City of Jackson within two years from the date of withdrawal, a penalty of $30,000 will be assessed as liquidated damages.

¶14. Dr. Braden states in his affidavit that CCC was formed to meet the University's requirement that Dr. Braden and other pediatric cardiologists at the University be responsible for the billing and collecting of income. Dr. Braden submits that CCC was a vehicle for the collection and distribution of income. He states that "[t]his arrangement was dictated by UMC." What Dr. Braden means by "dictated" is not clear. There is nothing in the contract documents or bylaws requiring such an organization. Furthermore, the partnership documents certainly do more than allow for the collection and distribution of income. For instance, as noted above, the documents provide for the ownership of all equipment and office supplies, and for the provision of liability insurance, life insurance, and disability insurance. The documents even contain a non-competition clause. The documents repeatedly refer to the physicians' "private practice" of pediatric cardiology at the University. Interestingly, particularly in light of Dr. Braden's assertion that the physicians' contracts with the University "dictate" such a partnership, the partnership agreement contains no reference to the payment of any amount exceeding an income of $140,000 to the University. If the purpose of the partnership were solely to collect and distribute income as "dictated" by the contract with the University, the documents seemingly would mention the mechanism by which the University was to be paid its fifty percent.

¶15. Furthermore, Dr. Braden states in his Response to Plaintiffs' Third Set of Interrogatories that the arrangement under which CCC would collect and distribute income was "expressly controlled and permitted by UMC as set forth in [his] contract." There is no mention in the contract documents of control over such an arrangement or permission to form such an arrangement. Also, the W-2's from the University show taxes assessed on Dr. Braden's salary as assistant professor, but do not report the income Dr. Braden received from his practice. Dr. Braden listed the income received from his partnership with CCC and also that received from Pediatric Critical Care Associates, discussed below, on his income tax returns. He paid self-employment tax on that income.

¶16. Dr. Braden was also a member of a partnership known as Pediatric Critical Care Associates (hereinafter, PCCA). Dr. Braden mentions in his affidavit that he was a member of PCCA, but does not clearly explain its purpose or function. The partnership was formed July 1, 1992. Dr. Braden states in his Response to Plaintiffs' Third Set of Interrogatories that he was a member of PCCA from the first day of his employment with the University until the group's dissolution on June 30, 1995. The Director of the Pediatric Critical Care Division of the University, designated by the partnership agreement as the managing partner of the partnership, was responsible for the day-to-day operation of the partnership and could negotiate on behalf of the partnership. Dr. Braden states in his Response that the care given by PCCA to University patients was provided at the "behest and direction" of the Department of Pediatrics. Dr. Braden states that his employment at the University was "contingent upon [his] agreeing to provide care for these patients." There is no indication, however, that there was any requirement that Dr. Braden be a member of the partnership to provide that care.

¶17. Like the CCC agreement, the partnership agreement of PCCA states that the partnership offices are to be located at the University or at any location that the partners later agree to designate. The agreement states that all business expenses, including employee salaries and equipment, are to be paid by the partnership. Interestingly, Dr. Braden's affidavit states that the University paid the salaries of "office support staff." From the PCCA documents, however, it appears that at least some salaries of office staff were paid by the partnership.

¶18. The documents state that all fees for pediatric intensive care services other than salary from the University are considered the income of the partnership. Income is to be distributed monthly according to the number of shares each partner had in the partnership. Membership is limited to the faculty members of the Department of Pediatrics at the University.

¶19. The plaintiffs emphasized repeatedly to the trial judge that they wished to depose Dr. Braden. Dr. Braden's affidavit states that the University provided his office space and that the University had complete control over which patients he saw and over how many patients he saw. However, as the plaintiffs pointed out to the trial judge, the contract documents and bylaws contain nothing about office space or control over patients treated. Dr. Braden also discusses briefly in his affidavit the formation and purpose and formation of CCC. The partnership documents of CCC seemingly contradict Dr. Braden's explanation of the partnership. The deposition of Dr. Braden would possibly have shed light on the conflict or absence of conflict regarding the partnership's relation to Dr. Braden's employment status.

¶20. Also conflicting with Dr. Braden's assertion that he is strictly an employee of the University is information provided by Dr. Braden in his application for malpractice insurance. Dr. Braden contends in his affidavit that he was solely employed by the University and that, unlike private doctors, had no private practice separate from the University. However, in the coverage application, dated July 26, 1994, and submitted to Medical Assurance, in response to the request that he name all hospitals where he intends to practice during the coverage period, Dr. Braden lists, in addition to the University, both Woman's Hospital and Methodist Medical Center where he was apparently serving as a consultant. Dr. Braden lists the same three hospitals in answer to the application's request that he provide the name of "any health-care institution in which you hold or are applying for staff privileges" to which the insurer should send a Certificate of Insurance. Interestingly, Dr. Braden's affidavit states that he is prohibited from acting as the "primary treating physician" anywhere but at the University. Dr. Braden, though he states that he is prohibited from admitting patients anywhere but at UMC, never states that he is prohibited from having and utilizing staff privileges at other hospitals. It seemingly would be of importance in the trial court's determination of the motion for summary judgment whether it was possible for Dr. Braden to treat patients at other hospitals without violating the prohibition that he not be the "primary treating physician." Apparently, Dr. Braden was permitted, at least, to consult with other physicians regarding the care of patients at other hospitals.

¶21. Furthermore, in the same coverage application, in response to the request that he check the appropriate description of his practice, Dr. Braden checked the box entitled "partnership," not the box entitled "employer/employee relationship." Dr. Braden also requested partnership liability. However, the declarations page of that policy states that Dr. Braden carries individual professional liability, not partnership liability. It is not clear from the record whether CCC or Dr. Braden paid the insurance premiums. The partnership agreement of CCC states that the partnership will pay the premiums, and that each partner must carry at least $3,000,000 per occurrence and $3,000,000 aggregate. Dr. Braden carried this amount.

¶22. The issue of Dr. Braden's employment status has not been fully fleshed out. There exists conflicting evidence, particularly in regards to the partnerships of which Dr. Braden was a member. Given that there are questions of fact remaining on the issue, specifically with regard to the partnership formed by Dr. Braden and other pediatric cardiologists, coupled with the plaintiffs' having previously attempted to conduct discovery on this issue, the trial court's grant of summary judgment was premature.

¶23. This Court has recently considered the issue at hand in *Owens v. Thomae*, 759 So. 2d 1117

(Miss.1999). At issue in *Owens* was the employment status of a surgeon and two resident doctors. The case was filed in July 1997. In August 1997, Owens subpoenaed the personnel records of all three doctors, and all three filed motions to quash or for a protective order. In November 1997, five months after the complaint was filed, the trial judge held a hearing on the doctors' motions to dismiss. Though Owens made no written request for additional time to conduct discovery, at the hearing Owens explained to the trial judge her need for more time to pursue discovery on the issue of the doctors' employment status. Nevertheless, the trial court granted summary judgment in favor of all three doctors, finding that all three were employees of the University and, thus, were entitled to the protections of the Tort Claims Act. On appeal, Owens contended that the trial court improperly granted the doctors' motions for summary judgment without allowing her additional time for further discovery. This Court held that the trial court was correct in determining that the two residents were employees of the hospital, but that the employment status of the surgeon was unclear. *Owens*, 759 So. 2d at 1122. The Court stated that, in light of Owens' request for a continuance in order to conduct discovery, coupled with her having previously attempted to conduct discovery on the issue and the fact that the discovery needed was in the possession of the party moving for summary judgment, further discovery should have been permitted on the issue of the surgeon's employment status. *Id*. This Court stated, "Contested status issues invariably require discovery.... While summary judgment may be appropriate where the status issue has been fully fleshed out and there are no material issues of fact, it cannot be said that the status issue in this case has been fully fleshed out." *Owens*, slip op. at 8-9 (citations omitted).

¶24. As in *Owens*, the trial court's grant of summary judgment in the case at hand was premature. The plaintiffs diligently pursued discovery on the issue of Dr. Braden's employment status. Though the plaintiffs filed their complaint in July 1996, Dr. Braden did not file his amended answer asserting that he is an employee of the University subject to the notice and limitations provisions of the Act until December 1996. The plaintiffs began discovery of the issue. Their subpoena duces tecum issued to Medical Assurance was met with motions to quash filed by Medical Assurance and Dr. Braden. Even prior to the trial court's order limiting discovery on the issue, the plaintiffs expressed their need for full discovery, particularly their desire to depose Dr. Braden. In March of 1997, just three months after Dr. Braden filed his amended complaint asserting the Tort Claims Act, the trial judge issued its order limiting discovery. The plaintiffs then pursued further discovery, and at the hearing on Dr. Braden's motion to dismiss, just five months after the order limiting discovery, the plaintiffs again requested that they be allowed to depose Dr. Braden and reiterated their desire to obtain the insurance records at the hearing on Dr. Braden's motion to dismiss. Their request was denied, and summary judgment granted in favor of Dr. Braden.

¶25. This Court has explained that the "party resisting summary judgment must present specific facts why he cannot oppose the motion and must specifically demonstrate 'how postponement of ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact.'" *Owens*, 759 So. 2d at 1120 (citing *Prescott v. Leaf River Forest Prods, Inc.*, 740 So. 2d 301, 307 (Miss. 1999)). The plaintiffs demonstrated in detail their need for further discovery to the trial judge in June of 1997 in their Response to Medical Assurance's Motion to Quash as well as at the hearing on Dr. Braden's Motion to Dismiss. The plaintiffs clearly attempted to obtain information regarding Dr. Braden's relationship with the University, but were hindered in their ability to do so by the trial court's limiting of discovery, particularly the trial court's refusal to allow the plaintiffs to depose Dr. Braden and the trial court's failure to rule on the motions to quash the plaintiffs' subpoena duces tecum to Medical Assurance. Though the plaintiffs did not file a motion to compel in response to the motions to quash, they did file a

response pleading and requested at the hearing on the motion to dismiss that the trial judge require compliance with the subpoenas. It cannot be said that the plaintiffs were dilatory in attempting discovery on this issue.

¶26. Dr. Braden argues that this Court should be persuaded by the Opinion of the Attorney General of Mississippi, No. 98-0500 (Sept. 4, 1998). In that opinion, written in response to a letter from a University official, the Attorney General states:

> <u>Based upon the facts as stated in your letter</u> and the statutes cited hereinabove, it is our opinion that staff physicians under contract with the University of Mississippi Medical Center are employees of a governmental entity of the State of Mississippi, and the Medical Center is responsible for affording them a defense and paying any judgment against them or settlement for any claim arising out of an act or omission within the course and scope of their employment, and within the limits of the Mississippi Tort Claims Act.

(emphasis added). It is important to note that the Attorney General states that the opinion is based upon the facts stated in the letter from the University. Specifically, the letter states:

> Faculty of the University of Mississippi Medical Center, sometimes referred to as staff physicians enter into a contract for their services and receive payment therefor from the University of Mississippi Medical Center, an agency or arm of the State of Mississippi. In addition, they are required to participate in a faculty practice plan pursuant to their employment contract with the Board of Trustees. The practice plans as approved by the Board of Trustees since 1955, provide additional income for faculty physicians, a portion of which is payable to UMMC.

¶27. It is not clear that the Attorney General's opinion, based upon the limited facts presented in the University's letter, is persuasive in the situation at hand. First, there is no provision in the contract documents contained in the record which states that Dr. Braden is required to maintain a practice. Second, it is not clear that Dr. Braden's contract included a "faculty practice plan." There is no mention of such in the record. And third, whether an individual is considered an employee or independent contractor is an incredibly fact-sensitive determination which can hardly be rubber-stamped by a holding that applies across-the-board to all physicians on salary at the University.

¶28. This Court recently considered the Attorney General's opinion in ***Pickens v. Donaldson***, 748 So. 2d 684 (Miss. 1999). Pickens brought an action for negligent diagnosis against Doctors John Donaldson, Vibha Vig, and Alan Causey, all physicians at UMC. As in the case at hand, the issue in ***Pickens*** issue was whether the doctors treated the patient as independent contractors, charging fees for the services separate and apart from what was charged by the University. The trial court granted summary judgment in favor of all three doctors. Pickens argued on appeal that summary judgment was improper and that full discovery should continue. This Court held that summary judgment was properly granted in favor of Dr. Vig, but that summary judgment was improper in regards to Doctors Donaldson and Causey, stating that the case should be remanded for additional discovery. *Id.* at 689-90. The Court referred to the Attorney General's opinion discussed above, noting its explanation that staff physicians at UMC are not compensated solely by the State. *Id.* at 688. The Court distinguished Doctors Donaldson and Causey from Dr. Vig, who clearly claimed she is *not* a staff physician. *Id.* at 689. The Court noted that because Doctors Donaldson and Causey did not claim that they are not staff physicians, there was a question as to whether they might not be covered by the MTCA. *Id.* The Court remanded the case for further discovery on the issue. Dr. Braden

makes no claim that he is not a staff physician.

¶29. Not only was the trial court's grant of summary judgment premature, but it is even questionable whether the trial judge truly found there was no issue of fact as to Dr. Braden's employment status. In explaining to plaintiffs' counsel why he was granting summary judgment in favor of Dr. Braden, the trial judge stated:

> Let me tell you where I am. I've heard this enough times that I'm really concerned about it. We have all these doctors at University Medical Center that are allowed to engage in what they say is not a private practice but which looks just like one. And then when something happens, they run under the immunity umbrella. And I think it's a serious enough question that it needs to be addressed. And I think the Supreme Court needs to address it because I don't know whether they're employees of the State or not to be honest with you. I don't know, which is why I allowed some discovery to explore it. Every time I've been presented with it before, the case ended up being resolved without that question ever being ultimately answered by the Supreme Court. So I don't know what the answer is.

At the hearing on Plaintiffs' Motion to Reconsider, the following exchange took place between the trial judge and plaintiffs' counsel, Chris Breard:

> Mr. Breard: . . . But the point still is that there appears to be at least some doubt in the Court's mind as to the employment status of these individuals.

> The Court: Oh, I'm telling you I don't know.

> Mr. Breard: Well, under those circumstances that's what I'm saying, summary judgment should be inappropriate.

> The Court: Well, I'm telling you I don't know but I'm also telling you that it's not an issue for determination by a jury. I don't know and I want them to tell me. I don't think the jury is going to be able to tell me that. . . . I'm convinced that the motion was appropriately granted but I'm saying to them on the record: I don't know, Supreme Court. Please tell me.

¶30. It is a well-established principle that summary judgments should be granted with great caution. ***Brown v. Credit Ctr., Inc.***, 444 So. 2d 358, 362 (Miss. 1983). It appears from the above statements that the trial judge granted summary judgment, not out of an exercise of caution, but rather out of an exercise of frustration. From these statements, it appears that the trial judge granted the motion for summary judgment merely to "pass the buck" to this Court, without making a determination that there was no issue of fact on the issue. The completion of discovery is, in this case, desirable.

¶31. The plaintiffs also urge this Court to interpret the definition of "employee" in § 11-46-1(f) to exclude physicians such as Dr. Braden. The plaintiffs submit that the legislature's intent to exclude physicians such as Dr. Braden from the definition of "employee" is demonstrated by the failure of the both houses of the State legislature to pass proposed revisions which would have included in the definition "interns, residents and fellows at the University of Mississippi Medical Center and all other physicians employed by the state or a political subdivision." H.B. 416, S.B. 2565. Both bills died in committee.

¶32. This argument is problematic. The legislative intent of a statute can hardly be based solely on that which the legislature failed to do. Such an interpretation would amount to the legislature's having spoken by

its silence, or, stated otherwise, taken action by inaction. It could just as easily be said that the legislature did not pass the revisions to section § 11-46-1(f) because it determined the additional language to be superfluous and the existing language to already adequately cover physicians such as Dr. Braden.

¶33. Nevertheless, though it cannot be said that the § 11-46-1(f), on its face, excludes Dr. Braden from the protections of the MTCA, it can not be said there is no question of fact as to Dr. Braden's employment status. The trial court's grant of summary judgment was improper. The trial court's judgment is therefore reversed, and this case is remanded for additional discovery.

¶34. On remand, the trial court shall utilize the test set forth by this Court in *Miller v. Meeks*, No. 1999-CA-00210-SCT, 2000 WL 863167 (Miss. June 29, 2000). As we noted in *Miller*, application of the traditionally applied *Richardson* factors has proven troublesome in evaluating the relationship between the University and its faculty physicians such as Dr. Braden. *Miller* at * 7 (citing *Richardson v. APAC-Miss., Inc.*, 631 So. 2d 143, 150 (Miss. 1994)). In *Miller*, this Court adopted the following five-part test for determining the employment status of doctors like Dr. Braden for the purposes of liability under the MTCA:

> 1. the nature of the function performed by the employee;
>
> 2. the extent of the state's interest and involvement in the function;
>
> 3. the degree of control and direction exercised by the state over the employee;
>
> 4. whether the act complained of involved the use of judgment and discretion;
>
> 5. whether the physician receives compensation, either directly or indirectly, from the patient for professional services rendered.

*Miller* at *8 (citing *James v. Jane*, 282 S.E.2d 864 (Va. 1980)). A full and meaningful application of these factors is currently not possible under the record before us. On remand and after further discovery, the trial court shall weigh these factors.

## II. THE ACTION IS NOT BARRED BY THE STATUTE OF LIMITATIONS OF MISS. CODE ANN. § 11-46-11(3).

¶35. The plaintiffs argue that even if Dr. Braden is an employee of the University and thus protected under the Act, the plaintiffs' action is not time-barred because the one-year statute of limitations did not begin to run until they were notified by experts of the possible causal relationship between Dr. Braden's alleged negligence and Brian's death. The Plaintiffs contend that even if the trial court's grant of summary judgment in favor of Dr. Braden was correct on the issue of whether Dr. Braden is an employee of the University, there exists a question of fact as to when the statute of limitations began to run and that this issue should be considered on remand.

¶36. After the completion of proceedings in the trial court and during the pendency of this appeal, this Court handed down *Barnes v. Singing River Hosp. Sys.*, 733 So. 2d 199 (Miss. 1999). The plaintiffs filed their Notice of Appeal on January 9, 1999. This Court handed down *Barnes* on January 12, 1999, and denied a motion for rehearing on April 22, 1999. The Plaintiffs cited the *Barnes* rationale in their appellate brief filed August 19, 1999. This was the earliest opportunity that the Plaintiffs could have cited to *Barnes*. Thus, though the Plaintiffs did not raise this argument before the trial court, the issue should be considered upon

remand.

¶37. The well-established discovery rule states that the statute of limitations is tolled until the actual discovery of the injury to be redressed. In ***Barnes*** this Court held that the discovery rule would be incorporated into actions involving latent injuries brought under the Mississippi Tort Claims Act. ***Id.*** at 203-06. We noted that to do so was particularly important given the relatively short one-year statute of limitations provided by the Mississippi Tort Claims Act. ***Id.*** at 205. In the case at hand, a question of fact exists regarding when the statute of limitations began to run. Because of ***Barnes***, which arose after the completion of proceedings in the trial court, the trial court should consider this issue on remand.

## III. THE TORT CLAIMS ACT IS UNCONSTITUTIONAL.

¶38. A party challenging the constitutionality of a statute must prove unconstitutionality beyond a reasonable doubt. ***Secretary of State v. Wiesenberg***, 633 So. 2d 983, 989 (Miss.1994); ***Mississippi Power Co. v. Goudy***, 459 So. 2d 257, 263 (Miss.1984). All doubts must be resolved in favor of validity of a statute. ***Loden v. Mississippi Pub. Ser. Comm'n***, 279 So. 2d 636, 640 (Miss.1973).

¶39. The plaintiffs argue that application of the Tort Claims Act to bar suit against Dr. Braden violates various constitutional guarantees. All arguments are without merit. First, the plaintiffs argue that the Act violates their right to due process by depriving them of their "day in court." This Court stated in ***Mohundro v. Alcorn County***, 675 So. 2d 848 (Miss. 1996), that no due process violation exists where the complaining party is not deprived of a protected property interest. ***Id.*** at 852 (citing ***Robinson v. Stewart***, 655 So. 2d 866, 869 (Miss. 1995); ***Tucker v. Hinds County***, 558 So. 2d 869, 873 (Miss. 1990)). This Court explained in ***Wells v. Panola County Bd. of Educ.***, 645 So. 2d 883 (Miss. 1994), that there was no right to sue the State or its political subdivisions at common law. ***Mohundro*** at 852. Because the Legislature has continued to withhold the right to bring such a suit, there is no property right to sue the State. ***Id.*** Thus, there can be no due process violation. ***Id.*** The Fifth Circuit reached the same conclusion in ***Grimes v. Pearl River Valley Water Supply Dist.***, 930 F.2d 441 (5th Cir. 1991).

¶40. The plaintiffs argue that the rationale of ***Mohundro*** is inapplicable to the case at hand because at common law there was a right to sue physicians. For this proposition, plaintiffs cite ***Womble v. Singing River Hosp.***, 618 So. 2d 1252 (Miss. 1993). The Court in ***Womble*** overruled prior case law which held that physicians employed by public entities are qualifiedly immune from suit for medical treatment decisions. ***Id.*** at 1263. The Court stated that physicians employed by public entities are not afforded protection by common law qualified immunity where their decisions do not involve formulating or implementing public policy. ***Id.*** at 1265. The Attorney General, via amicus brief, argues that though there has always been a right to sue physicians, there has also always been sovereign immunity for state employees, and that because ***Womble*** addressed pre-Act liability issues, its analysis does not apply to the case at hand.

¶41. The Attorney General's discussion of the inapplicability of ***Womble*** to the current provisions of the Act misses the mark. The plaintiffs' purpose in discussing ***Womble*** is to show that, at common law, physicians were not protected by qualified immunity, and that because ***Mohundro***'s holding rested upon a finding that, at common law, there was no right to sue the State or its subdivisions, ***Mohundro***'s rationale is inapplicable.

¶42. Nevertheless, even if there were a common law right to sue a physician, the plaintiffs' due process rights have not been violated. As the Fifth Circuit explained in ***Grimes***, the plaintiffs' claim that they have

been deprived of their "day in court" involves the concept of procedural due process. *Grimes,* 930 F.2d at 444. To prevail on a claim for denial of procedural due process, the plaintiffs must show not only that they were deprived of a protected property interest, but also that they were denied the process due them. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428, 102 S.Ct. 1148,1154, 71 L. Ed. 2d 265 (1982). The United States Supreme Court has explained that a state may erect reasonable procedural requirements for triggering the right to adjudication, such as statutes of limitations, and a state accords due process when it terminates a claim for failure to comply with a reasonable procedural rule. *Logan*, 455 U.S. at 437, 102 S.Ct. at 1158-59. Even should Dr. Braden be found to be an employee of the University, the Plaintiffs are not denied a right to adjudication. The Act does not necessarily prohibit the Plaintiffs' action, but merely restricts the time in which they may bring the action. The Fourteenth Amendment requires only "an opportunity. . .granted at a meaningful time and in a meaningful manner." *Id.* (*quoting Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). The plaintiffs fail to demonstrate that they were denied the process due them.

¶43. The plaintiffs also argue that the Act violates the Remedy Clause of Miss. Const., Art. 3, § 24, which provides that the courts shall be open and a remedy shall be available for every injury. This Court held in *Mohundro* that the Act does not violate the Remedy Clause. The Court noted that "the remedy clause is not an absolute guarantee of a trial and that it is the legislature's decision whether or not to address restrictions upon actions of government entities." *Mohundro,* 675 So. 2d at 852 (citing *Robinson,* at 868-69). The Court explained,

> The Mississippi Constitution places no limitation on the Mississippi Legislature's ability to enact legislation. . . . The basic principle of sovereign immunity is that the "king can do no wrong." Consequently, the state is free from any liabilities unless it carves an exception. These exceptions come in the form of tort claims acts. The Mississippi Legislature has carved no such exception for this type of suit. . . and the "remedy clause" of the Mississippi Constitution does not require them to do so.

*Mohundro,* 675 So. 2d at 852 (quoting *Grimes,* 930 F.2d at 443-44).

¶44. The plaintiffs also contend that the Act violates their right to trial by jury. They seem to assert this interchangeably with their assertion that the Act violates the Remedy Clause and their due process right to a "day in court." They make no independent argument regarding any violation of the right to trial by jury. There is no right to trial by jury to actions brought under the Act pursuant to § 11-46-13.

¶45. The plaintiffs also assert the Act violates their right to equal protection. This argument is without merit as well. First, the plaintiffs apparently base this argument on the assertion that if Dr. Braden is protected under the Act, he is treated differently from other physicians practicing medicine in Mississippi. This Court stated in *Mississippi Ins. Guar. Ass'n v. Gandy*, 289 So.2d 677, 679 (Miss. 1973), that "one who is not prejudiced by the enforcement of an act of the legislature cannot question its constitutionality or obtain a decision as to its constitutionality on the ground that it impairs the rights of others." The plaintiffs fail to demonstrate that they are denied equal protection under the Act, that is, that they are treated differently from others similarly situated. They argue only that Dr. Braden is treated differently from other physicians practicing medicine in this state. Furthermore, this Court has held that the Act does not violate equal protection, *Vortice v. Fordice*, 711 So. 2d 894 (Miss. 1998), as has the Fifth Circuit, *Grimes v. Pearl River Valley Water Supply Dist.*, 930 F.2d 441 (5th Cir. 1991). Because the plaintiffs do not constitute a class which would require the use of strict or intermediate scrutiny, the rationale of both *Fordice* and

*Grimes* applies to the case at hand.

¶46. Finally, the plaintiffs argue that the notice and statute of limitations provisions of § 11-46-11 and the definition of "employee" found in § 11-46-1(f) are unconstitutionally vague. This Court has held that the notice provision of § 11-46-11is not unconstitutionally vague. *Holmes v. Defer*, 722 So. 2d 624 (Miss. 1998), *overruled on other grounds by Carr v. Town of Shubuta*, 733 So. 2d 261 (Miss. 1999) (citing *City of Jackson v. Lumpkin*, 697 So. 2d 1179 (Miss. 1997), overruled on other grounds by *Carr*)). The plaintiffs' argument regarding the one-year statute of limitations is likewise without merit. A statute is unconstitutionally vague when people of common intelligence must guess at its meaning and differ as to its application. *Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L. Ed. 322 (1926). Section 11-46-11(3) states, "All actions brought under the provisions of this chapter shall be commenced within one (1) year next after the date of the tortious, wrongful or otherwise actionable conduct . . . ." People of common intelligence are not forced to guess at the meaning of this provisions. It could not be clearer. Finally, the plaintiffs' argument that the definition of "employee" is unconstitutionally vague is likewise misplaced. Section 11-46-1(f) states:

> "Employee" means any officer, employee or servant of the State of Mississippi or a political subdivision of the state, including elected or appointed officials and persons acting on behalf of the state or a political subdivision in any official capacity, temporarily or permanently, in the service of the state or a political subdivision whether with or without compensation. The term "employee" shall not mean a person or other legal entity while acting in the capacity of an independent contractor under contract to the state or a political subdivision; provided, however, that for purposes of the limits of liability provided for in Section 11-46-15, the term "employee" shall include physicians under contract to provide health services with the State Board of Health, the State Board of Mental Health ro any county or municipal jail facility while rendering services under contract.

The plaintiffs contend that this provision must be vague because the parties, and, apparently, even the trial judge, could not agree as to whether Dr. Braden is an employee of the University. The fact that the parties disagree as to whether an individual is an employee does not mean the statute's definition is vague. The question of whether an individual is an employee or independent contractor is necessarily a fact-sensitive determination.

### CONCLUSION

¶47. There is, at present, an issue of fact regarding Dr. Braden's employment status at the University. The trial court's grant of summary judgment is therefore reversed, and this case is remanded to the trial court for completion of discovery on this issue. There also exists an issue of fact regarding when the statute of limitations began to run against the plaintiffs' action. Should the trial court determine that Dr. Braden is an employee of the University, the trial court should consider, in light of this Court's opinion in *Barnes v. Singing River Hosp. Sys.*, 733 So. 2d 199 (Miss. 1999), whether the one-year statute of limitations has run against the plaintiffs' claim. The plaintiffs' contention that the Tort Claims Act is unconstitutional is without merit.

¶48. **REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**PITTMAN, P.J., MILLS, WALLER AND COBB, JJ., CONCUR. BANKS, P.J.,**

**CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY McRAE AND DIAZ, JJ. McRAE, J., CONCURS IN PART AND DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DIAZ, J., AND JOINED IN PART BY BANKS, P.J. PRATHER, C.J., NOT PARTICIPATING.**

**BANKS, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶49. While I agree with most of what the majority has to say, in my view, it misses the mark in considering whether the remedies clause of our constitution is violated by tort claims legislation immunizing state employees in instances where they were not so immunized at common law at the time that the remedies clause was adopted. I too, would reverse and remand, and I agree that the least that is required is a determination whether the defendant physician was in fact acting solely as a state employee as we have refined the question in *Miller v. Meeks*, No. 1999-CA-00210-SCT, 2000 WL 863167 (Miss. June 29, 2000). I go further, however, and also acknowledge that the tort claims act is unconstitutional insofar as it immunizes state employees from suit.

¶50. The majority correctly observes that while *Muhondro v. Alcorn County*, 675 So. 2d 848 Miss. 1996), addressed certain constitutional claims as relating to the immunity of the sovereign, it did not address those claims as they affect immunity for state employees. That is, the answer that the tort claims act does not detrimentally affect a common law right because there was no cause of action against the sovereign at common law, does not hold true for state employees. Inexplicably, the majority recognizes this fact with regard to the due process claim but ignores it when it discusses the remedies clause claim where it is equally applicable. We have never squarely addressed the issue whether the remedies clause of Section 24 of our constitution is violated by legislation which immunizes state employees from suit. I suggest that we answer the question in the affirmative, for the reasons stated in my dissent in *Sullivan v. Washington*, No. 1998-CA-01518-SCT, 2000 WL 1161072 (Miss. Aug. 17, 2000).

¶51. While, unlike the case in *Sullivan v. Washington* here some benefit is provided in lieu of the common law right of action, the benefit is in my view insufficient as a substitute.[2] Parties allegedly injured by the negligence of a state employee are treated with a shortened statute of limitations, sometimes burdensome notice requirements, a laundry list of specific conduct exemptions and a cap on damages recoverable. In exchange for this, the tort claims act provides only that the state will be liable for some of the tortious acts of its employees. In my view, the substitute remedy is illusory and in many instances no substitute at all. I would hold that there the benefits accorded under the tort claims act are insufficient to support that act's immunization of state employees for conduct not covered by qualified immunity. I would declare that aspect of the act unconstitutional.

**McRAE AND DIAZ, JJ., JOIN THIS OPINION.**

**McRAE, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶52. While I agree with the majority in reversing this case as there are clearly unresolved issues of fact, I must dissent to the inference that Dr. Braden could be shrouded with immunity under our state's Tort Claims Act. Such a finding would strip the plaintiffs of a property right without due process. There is no need for further discovery in order to resolve Dr. Braden's employment status. As a member of a partnership supplying services to the hospital, he is in a "dual capacity" and cannot seek shelter under the Act. In addition it would put a cap on the amount of recovery allowed which is in direct conflict with the remedy

clause. There never was intended, nor should there be, a limit to an individual's right to redress harm. Accordingly, I concur in part and dissent in part.

¶53. "It is not within the power of the legislature to deny a remedy in the courts for the vindication of a legal right or the redress of a legal wrong."[3] Apparently in the years that have passed since former Justice George Ethridge made this statement, the majority has forgotten its meaning and the importance of Article e, Section 24 of the Constitution of 1890, which reads:

> All courts shall be open; and every person for an injury done to him in his lands, goods, person or reputation, shall have remedy by due course of law; and right and justice shall be administered without sale, denial, or delay.

¶54. The majority fails to recognize that holding Dr. Braden immune is in violation of the remedy clause in several ways, as well as the constitution that secures the right to a trial by jury. As noted by Justice Sullivan in his dissenting opinion in *Robinson v. Stewart*, 655 So.2d 866 (Miss. 1995), "While this clause does not explicitly grant an infinite, unlimited guarantee to seek a remedy by due course of law, **a statute which denies a potential litigant any possibility of bringing suit violates its clear meaning.**"

¶55. The plaintiffs were denied their constitutional right to open access to the courts and due process when they were denied the opportunity to depose Dr. Braden, his partners at Children's Cardiac Care Consultants, the representative of his insurer, Medical Assurance and the administrative personnel and Board of Directors at the University of Mississippi Medical Center regarding his status as an employee or independent contractor.

¶56. The fact that Dr. Braden is an employee of the University of Mississippi Medical Center for some purposes does not affect liability for his negligence while privately practicing medicine and earning outside income. Similar situations involving a "dual capacity" employee have been considered by this Court. We have recognized that as "the rule which acknowledges that a person may be an independent contractor as to certain work and a mere agent or employee as to other work for the same employer." *Kight v. Sheppard Bldg. Supply, Inc.*, 537 So.2d 1355, 1359 (Miss. 1989).

¶57. The language of Miss. Code Ann. § 11-46-1 does not specifically include physicians practicing medicine who also happen to be professors at the University of Mississippi Medical Center. The history of this state's treatment of such physicians supports the idea that they are to be held personally liable for medical treatment decisions. *Womble v. Singing River Hosp.*, 618 So.2d 1252 (Miss. 1993). Moreover, the legislative intent to not include these physicians is supported by the fact that since the enactment of the state tort claims act, the legislature has revisited the definition in two bills introduced in the 1997 session of the legislature.[4] Both bills attempted to expand the act to included physicians such as Dr. Braden in the definition of employee. Neither bill became law. Such is indicative of the legislative intent to exclude University of Mississippi Medical Center physicians from the Act.

¶58. To include physicians in the position of Dr. Braden would require a court to judicially interpret the statute. Are we to say then that an injured patient should be required to "guess" the doctor's employment status? Even the judge sitting in this case was unsure of Dr. Braden's status while hearing arguments on a Motion to Dismiss:

> I've heard this enough times that I'm really concerned about it. We have all of these doctors at

University Medical Center that are allowed to engage in what they say is not a private practice but which looks just like one. . . And I think the Supreme Court needs to address this because I don't know whether they're employees of the State or not to be honest with you.

If a trial judge is unsure about Dr. Braden's status, the burden of deciding should not be put on the plaintiffs.

¶59. Dr. Braden was employed by the state of Mississippi to **teach** medicine, not **practice** it. In fact, Dr. Braden's W-2's from the University of Mississippi Medical Center show his income there as an "assistant professor." Further, Dr. Braden also produced income tax returns from the separate partnership of the Children's Cardiac Consultants of which he was charged self-employment tax. The limitations in the contract pointed out by Dr. Braden as limiting the scope of his medical practice, and his ability to choose what patients to treat is not controlling. What is controlling is Dr. Braden's relationship with his patients. Any limitations found in the contract do not change the fact that when he is treating a patient, Dr. Braden is practicing medicine as a partner in CCC, hired by the medical center. The patient is incurring charges billed by CCC for treatment performed by Dr. Braden. **In fact, the patient receives a separate bill from the University of Mississippi Medical Center**. Clearly from the facts set forth above Dr. Braden is not within the definition of state employee. He was part of a separate partnership, separate billing, separate income which he paid self-employment taxes, separate liability insurance, and separate counsel when sued. Working in a "dual capacity", Dr. Braden is answerable for any potential negligence involved in the treatment of the Smiths' son.

¶60. In a pre-Tort Claims Act case, *Womble v. Singing River Hosp.*, 618 So.2d 1252 (Miss.1993), this Court considered whether doctors employed by a public entity hospital should be protected by qualified immunity. We held these doctors did not implement policy and were, therefore, not protected by immunity:

> None of the considerations undergirding common law qualified immunity are applicable to medical treatment decisions. **First of all, there is nothing inherently governmental about decisions regarding individual medical treatment. They do not involve the formulation of public policy in any respect. Therefore, the notion of promoting governmental decisions that are in the public good is completely inapplicable.** Second the fact that a physician or other medical provider is employed by the State does not expose that physician to any greater threat of suit than he would otherwise face in private practice.

*Womble*, 618 So.2d at 1263-64 (emphasis added).

¶61. If Dr. Braden is held to be an employee protected by the Tort Claims Act, the Smiths are denied equal protection under the law, as well as their right to a trial by jury, especially in light of the fact that Dr. Braden was a partner in another partnership and chose to personally carry his own insurance policy. If Dr. Braden was in fact a state employee under the act as he claims, there would be absolutely no need for insurance because the University of Mississippi Medical Center would provide for his defense and he would be "allegedly immune" and not need the coverage.

¶62. In the event the Tort Claims Act is found to be applicable to Dr. Braden's position, the plaintiffs' action should not be barred by the one-year statute of limitation. Dr. Braden does not work directly for an institution that enjoys immunity. Rather, he is a partner and agent in Children's Cardiac Care Consultants which provides work to the University of Mississippi Medical Center on a contract basis. In fact, he was also serving as a partner in the Pediatric Critical Care Assistance ("PCCA"). A contractual relationship

between a state or government owned hospital and a physician should not be sheltered under the umbrella of immunity for negligent acts in the treatment of patients, particularly when there is no notice to the patient and the partnership and physician receives compensation from the patient directly.

¶63. This Court has adhered to a discovery rule in actions brought under the Tort Claims Act:

> There may be rare cases where the patient is aware of his injury prior to the [expiration of the limitations period], but does not discover and could not have discovered with reasonable diligence the act or omission which caused the injury. In such cases, the action does not accrue until the latter discovery is made.

*Smith v. Sanders*, 485 So.2d 1051, 1052-53 (Miss. 1986). Under the circumstances, the plaintiffs never had proper notice of Dr. Braden's alleged employment status. In addition, while the plaintiffs were aware of the death of their son, they had no way of knowing that Dr. Braden was responsible for those injuries until notified by experts. This effectively tolled the running of the statute of limitations and Tort Claims Act notice provisions which might apply.[5]

¶64. At the very least, a summary judgment should never have been entered in this case. To dismiss this suit under the Act due to the statute of limitation would once again be protecting those who least need it and penalizing the victim. I would reverse and allow for a full trial on the merits.

¶65. Accordingly, I concur in part and dissent in part.

### DIAZ, J., JOINS THIS OPINION. BANKS, P.J., JOINS IN PART.

1. The most recent contract contained in the record provides that Dr. Braden's annual salary is $63,600. The arrangement regarding retention of fees earned by treating patients and splitting income in excess of $140,000 remains the same.

2. *Sullivan v. Washington* presented a case in which there was no remedy at all because the incident complained of occurred at a time when only statutory sovereign immunity was effective before the full tort claim act providing that the state would be liable for certain acts of its employer became effective.

3. Found in the book Mississippi Constitutions, written by former Associate Justice George H. Ethridge of the Supreme Court of Mississippi and published in 1928.

4. HB 416 and Senate Bill 2565, 1997.

5. *See also* Senate Bill 2974 which amends § 11-46-11 to provide a savings clause for those under the disability of infancy or unsoundness of mind limited to 21 years. Effective on passage. Signed 4/10/2000.