# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2021-CA-00430-SCT

*THE STATE OF MISSISSIPPI, BY AND
THROUGH MICHAEL WATSON IN HIS
OFFICIAL CAPACITY AS SECRETARY OF
STATE AS TRUSTEE OF PUBLIC TIDELANDS*

*v.*

*LONG BEACH HARBOR RESORT, LLC*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/01/2021 |
| TRIAL JUDGE: | HON. JAMES B. PERSONS |
| TRIAL COURT ATTORNEYS: | MICHAEL CAVANAUGH |
| | MICHAEL WHITEHEAD |
| | JOSHUA W. DANOS |
| | HENRY LAIRD |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | JOSHUA W. DANOS |
| | G. CHARLES BORDIS |
| | OFFICE OF THE ATTORNEY GENERAL |
| | BY: MARY JO WOODS |
| ATTORNEYS FOR APPELLEE: | HENRY LAIRD |
| | MICHAEL CAVANAUGH |
| | MICHAEL WHITEHEAD |
| | FREDERICK T. HOFF, JR. |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED - 08/25/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE KITCHENS, P.J., MAXWELL AND CHAMBERLIN, JJ.**

**CHAMBERLIN, JUSTICE, FOR THE COURT**:

¶1.     Long Beach Harbor Resort, LLC (the Resort), leased a parcel of land located on the

Public Trust Tidelands from the City of Long Beach. This Court is asked to determine

whether the Resort is required to enter into a separate lease with the Secretary of State for the use of the tidelands property or whether the Resort already has a valid lease allowing use of the tidelands in question.  This Court finds that the State of Mississippi has, through its Boundary Agreement and Tidelands Lease with the City of Long Beach, ratified the prior lease entered into between the City and the Resort.  Accordingly, this Court affirms the chancery court's grant of summary judgment in favor of the Resort and finds that the Resort has a valid tidelands lease as ratified by the Secretary of State.

### FACTS AND PROCEDURAL HISTORY

¶2.     On February 11, 2010, the City of Long Beach Port Commission (Port Commission) and Blue Ridge Properties, LLC,[1] entered into an Amended and Restated Lease Agreement. (the Resort Lease)  The agreement was an assignment of a prior lease that originated on September 18, 2000, between the Port Commission and a different entity.  Two parcels of land were included in the 2010 lease: Parcel A was north of U.S. Highway 90 where a building with a value of no less than $750,000 was to be constructed, and Parcel B was a parking lot south of U.S. Highway 90.

¶3.     The Resort Lease granted the Resort exclusive gaming rights to the property.  Article 5, section 1, allowed the Resort to operate gaming on the premises so long as it was in compliance with the rules of the Mississippi Gaming Commission, and "no actual gaming activities [were to] be conducted or permitted south of U.S. Highway 90."

¶4.     Article 17 of the Resort Lease was titled "Quiet Enjoyment" and contained the

---

[1] On July 24, 2018, Blue Ridge Properties, LLC, merged into Long Beach Harbor Resort, LLC.

2

following provision in section 2:

> Lessor makes no warranties, either express or implied regarding any claim or asserted claim to any portion of the leasehold property as public trust tidelands. Lessee must satisfy himself as to the status of any such claims, and Lessee's only relief or recourse in the event of such a claim or determination is cancellation hereof.

This provision recognized that, in the event the Secretary of State insisted that the Resort needed a tidelands lease, the City would not be a party to that dispute.[2]

¶5.    On May 18, 2011, the City and the Port Commission[3] entered into a Boundary Agreement with the State of Mississippi, through the Secretary of State, to delineate the Public Trust Tidelands within the Long Beach harbor.  The land agreed to be Public Trust Tidelands included a portion of the land from the Resort Lease.

¶6.    On the same day, the City, with the approval of the Port Commission, entered into a Tidelands Lease with the Secretary of State.  The lease authorized the City to use the tidelands defined by the Boundary Agreement but located within the city harbor.  A portion of the land leased to the Resort for a parking lot was included in this Tidelands Lease.  The Tidelands Lease authorized the city to use the leased area in the tidelands for harbor and development uses only.

---

[2] After the legislature passed the Tidelands Act, Mississippi Code Sections 29-15-1 to -23 (Rev. 2020), the Secretary of State began mapping the boundary line of the tidelands. *Sec'y of State v. Wiesenberg*, 633 So. 2d 983, 991 (Miss. 1994).  Mississippi Code Section 29-15-1(h) (Rev. 2020) (internal quotation marks omitted) defines "Tidelands" as "those lands which are daily covered and uncovered by water by the action of the tides, up to the mean line of the ordinary high tides."

[3] The Long Beach Port Commission later merged with the City of Long Beach to become one entity.

¶7.    On December 5, 2017, the Resort entered into an Option Agreement with the Secretary of State for a Public Trust Tidelands Lease. The purpose of the Option Agreement was to allow the Resort and the Secretary of State to come to an agreement on the terms of a tidelands lease for the parcel of land the Resort was leasing from the City that was located on the tidelands. One of the Secretary of State's contingencies to entering a Tidelands Lease with the Resort was the cancellation or termination of any existing tidelands lease with the City and Port Commission. The Option Agreement expired on April 30, 2018, but the Secretary of State and the Resort never entered into a tidelands lease.

¶8.    On January 30, 2019, the Mississippi Gaming Commission meeting minutes reflect that the Resort was granted gaming site approval. At the time of this approval, the Resort was in the process of purchasing Parcel A, the land north of U.S. Highway 90, and had continued to rent Parcel B as a parking lot for its restaurant. Pursuant to Mississippi Code Section 97-33-1(b)(2) (Rev. 2020), the gaming site was to be constructed with the "entire proposed gaming area located onshore within eight hundred feet of the mean high water line of the Mississippi Sound." [4] The leased parking lot on the tidelands was used to satisfy the Mississippi Gaming Commission regulations and statutory requirement that the Resort control property adjacent to the waters of the Mississippi Sound that are continuous with the property where the actual gaming will be conducted and located within eight hundred feet of the mean high water line. *See* Miss. Code Ann. § 97-33-1; 13 Admin. Code Part 2, Rule 1.4 (adopted May 1, 2013), Westlaw. The parking lot was used as the reference point for

---

[4]The mean high water line is the "intersection of the tidal datum plane of mean high water with the shore." Miss. Code Ann. § 29-15-1(e) (Rev. 2020).

determining the eight hundred foot distance from the mean high water line.

¶9. On September 10, 2019, counsel for the Secretary of State sent a letter to the Resort's counsel with a proposed tidelands lease. In the letter, the Secretary of State required the tidelands property at issue to be removed from any prior leases and evidence that the City approved of a direct, gaming-related lease between the Resort and the Secretary of State. Once all the contingencies were met, the Resort could enter a tidelands lease.

¶10. On September 27, 2019, the Resort filed a declaratory judgment action against the State, by and through Delbert Hosemann, in his official capacity as then-Secretary of State. The Resort asked the chancery court to declare that the Resort did not need a tidelands lease because (1) "the real property is not part of the Mississippi Public Trust Tidelands"; (2) the use of the real property is for a higher public purpose pursuant to Mississippi Code Section 29-15-1 to -23 (Rev. 2020); and (3) the Mississippi Gaming Commission's approval of the site negated the need for approval from the Secretary of State pursuant to Mississippi Code Sections 75-76-1 to -63 (Rev. 2016).

¶11. On November 1, 2019, the State responded and argued that the Boundary Agreement was binding and required that the Resort have a lease. Additionally, the State argued that the property is held in trust by the State, with the Secretary of State as trustee, so any acquisition by the Resort of the tidelands was void.

¶12. On March 30, 2020, pursuant to Mississippi Rule of Civil Procedure 56, the Resort filed three motions for summary judgment arguing that no issues of material fact remained. The Resort argued in the three separate motions that (1) further approval from the State was

5

not required because the site had been approved by the Mississippi Gaming Commission as suitable for gaming; (2) the land was not a part of the Mississippi public trust tidelands; and (3) the real property was and will continue to be used for higher public purposes. In support of the second motion the Resort attached copies of various pieces of legislation. *See* H.B. 886, Reg. Sess., 1962 Miss. Loc. & Priv. Laws ch. 917; H.B. 1234, Reg. Sess., 1987 Miss. Loc. & Priv. Laws ch. 861; H.B. 1768, Reg. Sess., 2016 Miss. Loc. & Priv. Laws ch. 959.

¶13. Over the following months, the parties conducted discovery via interrogatories and requests for production of documents. Throughout the course of discovery, it was eventually established that the disputed property was part of the Public Trust Tidelands.

¶14. On December 14, 2020, the court entered a final judgment denying the Resort's first two motions for summary judgment and granting the third. In the final judgment, the court found:

> Resort has a valid and enforceable property right, albeit a leasehold interest, in and to the Leased Premises by virtue of its lease with the Port Commission/City of Long Beach. The Port Commission had the full jurisdiction, control and management of the Leased Premises as of the date of the Amended and Restated Lease, which was more than a year prior to the May 18, 2011, Boundary Agreement and the Public Trust Tidelands Lease between the City of Long Beach/Port Commission[.]

The court also found that

> the house bills vested the Port Commission with full jurisdiction and control of the Long Beach port and harbor without any reservation of the right to require lessees of the port commission to enter into tidelands leases with the State. . . . Further, the Court finds that grant and control of the Long Beach Harbor to the Port Commission does not violate Section 90 of the Mississippi Constitution. The Port Commission/City is a political subdivision of the State and not a private person or corporation.

6

The court amended the judgment on April 1, 2021, after the State filed a motion to reconsider. The court found that it did "not have jurisdiction to determine the rights between the parties with respect to the 'in lieu'" payments, but, otherwise, the judgment was unchanged.

¶15. The State appealed the final judgment granting the Resort's third motion for summary judgment, arguing that neither the City nor the Port Commission had the authority to lease the tidelands property; therefore, the Resort should be required to obtain a tidelands lease.

## STANDARD OF REVIEW

¶16. "This Court employs a *de novo* standard of review when considering a trial court's grant or denial of summary judgment." *Hobson v. Chase Home Fin., LLC*, 179 So. 3d 1026, 1033 (Miss. 2015) (citing *WW, Inc. v. Rainbow Casino-Vicksburg P'ship, L.P.*, 68 So. 3d 1290, 1292 (Miss. 2011)). Questions of law are reviewed de novo. *McNeil v. Hester*, 753 So. 2d 1057, 1063 (Miss. 2000) (citing *Consol. Pipe & Supply Co. v. Colter*, 735 So. 2d 958, 961 (Miss. 1999)). The facts of this case are not disputed. Only questions of law remain.

## DISCUSSION

### I. The Tidelands Act

¶17. The State, "upon entry into the Union, received ownership of all lands under waters subject to the ebb and flow of the tide." *Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469, 476, 108 S. Ct. 791, 98 L. Ed. 2d 877 (1988). "In 1989, the Mississippi legislature enacted the Public Trust Tidelands Act, codified in Mississippi Code Sections 29-15-1 through -23 (Rev. 2010)." *RW Dev., LLC v. Miss. Gaming Comm'n*, 307 So. 3d 404, 410-11 (Miss.

7

2020). The legislative purpose of the Tidelands Act was for "the preservation of the natural state of the public trust tidelands and . . . to resolve the uncertainty and disputes which have arisen as to the location of the boundary between the state's public trust tidelands and the upland property[.]" Miss. Code Ann. § 29-15-3(1), (2) (Rev. 2020). This Court has found the Tidelands Act to be constitutional. *Wiesenberg*, 633 So. 2d at 991.

¶18. The State has designated the Secretary of State as a trustee of the Public Tidelands Trust. Mississippi Code Section 29-1-107(2)(a) provides that the "Secretary of State, with approval from the Governor, may rent or lease surface lands, tidelands, or submerged lands owned or controlled by the State of Mississippi lying in or adjacent to the Mississippi Sound or Gulf of Mexico[.]" Miss. Code Ann. § 29-1-107(2)(a) (Rev. 2020). This Court has acknowledged this legislative grant of authority by holding that "[t]he Secretary of State asserts that he is the trustee for all public lands in Mississippi, including the public trust tidelands, under Miss. Code Ann. § 7-11-11 (Rev. 2002) and §§ 29-1-1 *et seq.* (Rev. 2000). We agree with the Secretary of State." *Columbia Land Dev., LLC v. Sec'y of State*, 868 So. 2d 1006, 1011 (Miss. 2004).

¶19. However, nothing prevents the legislature from creating an exception to the Secretary of State's authority over the tidelands. Pursuant to Mississippi Code Section 29-1-1, "[u]se and possession of the lands may be reassigned by act of the Legislature or by interagency conveyance where each agency has statutory authority to acquire and dispose of land." Miss. Code Ann. § 29-1-1(1) (Rev. 2020). This Court has stated that the tidelands are held in trust by the State and "may be alienated from the State only upon the authority of legislative

8

enactment and then only consistent with the public purposes of the trust." ***Bayview Land, Ltd. v. State ex rel. Clark***, 950 So. 2d 966, 973 (Miss. 2006) (internal quotation mark omitted) (quoting ***Wiesenberg***, 633 So. 2d at 987); ***Columbia Land Dev., LLC***, 868 So. 2d at 1013 ("The State, as trustee, may not divest itself of its duties. However, the state, by statute may vest in others the authority to do acts which the trustee cannot practicably be expected to perform." (internal quotation marks omitted) (quoting ***Wiesenberg***, 633 So. 2d at 997)).

II.     **The Boundary Agreement and Tidelands Lease between the Secretary of State and the City of Long Beach ratified the prior Resort Lease.**

¶20.    Each side has set forth numerous arguments, both before the trial court and on appeal, supporting their position. However, an analysis of those arguments is unnecessary because this case turns on one simple principle. The State of Mississippi, through its trustee, the Secretary of State, has explicitly ratified the Resort Lease entered into between the Resort and the City of Long Beach.

¶21.    The word "ratification" means "[c]onfirmation and acceptance of a previous act, thereby making the act valid from the moment it was done." *Ratification*, Black's Law Dictionary (11th ed. 2019). Ratification does not arise by operation of law; rather, "[a] person ratifies an act by (a) *manifesting assent* that the act shall affect that person's legal relations, or (b) conduct that justifies a *reasonable assumption* that the person so consents." ***Northlake Dev. LLC v. BankPlus***, 60 So. 3d 792, 797 (Miss. 2011).

> Ratification has an immediate effect on legal relations between the principal and agent, the principal and the third party, and the agent and the third party.

Ratification recasts those legal relations as they would have been had the agent acted with actual authority. Legal consequences thus "relate back" to the time the agent acted.

*Id.* (quoting Restatement (Third) of Agency § 4.02 cmt. b (Am. L. Inst. 2006)).

¶22. To be clear, the Resort's plan to include a restaurant and parking lot south of Highway 90 as part of its gaming establishment north of Highway 90 came as absolutely no surprise to the Secretary of State. In February 2010, the City of Long Beach's Port Commission entered into a lease with the Resort which stated, in article 5, section 1, that it was the express "intention of the parties that the Lease Premise may be used in connection with a gaming establishment, but that no actual gaming activities shall be conducted or permitted south of U.S. Highway 90." A year *later*, in May 2011, the Secretary of State and the City negotiated and resolved their dispute over the Tidelands in question by execution of the Tidelands Lease and Boundary Agreement. As part of that resolution, as noted in paragraph 6 of the Boundary Agreement and paragraph 2.1(b) of the Tidelands Lease, the Secretary of State permitted the City to use the Tidelands for restaurants and related parking. The Secretary of State also agreed, in paragraph 7 of the Boundary Agreement and paragraph 6.1(a) of the Tidelands Lease, to allow the City to lease the Tidelands for this permitted use. The Secretary of State further acknowledged, in paragraph 6.2(3) of the Tidelands Lease, that the City had already entered into the preexisting Resort Lease, along with other leases:

> 6.2 LESSEE represents to LESSOR that it has previously entered into the following leases covering portions of LEASED PREMISES:
>
> . . . .
>
> (3) Long Beach Port and Harbor Commission to Blue Ridge Properties, LLC dated February 11, 2010; amended May 10, 2010.

10

. . . .

To the extent necessary to provide good leasehold title in aforesaid Leases of the Long Beach Port and Harbor Commission, LESSEE may execute partial assignments of this LEASE, to the extent, but only to the extent such assignments do not convey any right or title not covered by this lease and do not violate any term or provision of this LEASE. In accepting such assignments, said assignees recognize this LEASE as source of title.

¶23.  It is inconsistent that the Secretary of State now contends the City's lease to the Resort to use the Tidelands for a restaurant and parking lot is not valid and that a separate lease with the State is now required.  Under the terms of the Resort Lease, article 5, section 1, the Resort could "only use the Leased Premises for the purpose of operating a restaurant . . . and for other incidental marine related purposes . . . ."  But the Resort Lease made clear that "[s]uch operation may be a part of a gaming/entertainment operation . . . ."  The terms of the ensuing Tidelands Lease between the City of Long Beach and the Secretary of State are consistent with the Resort Lease's stated plan.  The Tidelands Lease expressly permits restaurants and parking that support a gaming establishment if no actual gaming activities occur on the Tidelands.  Paragraph 2.2 of the Tidelands Lease states that "[a]ny facilities or amenities used in support of or in association with GAMING are not permitted uses under the terms of the LEASE, *except for DEVELOPMENT USES* permitted in Paragraph 2.1(b) of this LEASE[.]" (Emphasis added.)  According to paragraph 2.1(b) of the Tidelands Lease, development uses include "retail, fine dining or casual dining restaurants[.]"  Development uses also allow for adequate parking.  Therefore, based on its plain language, the Tidelands Lease permits facilities and amenities that support or are in association with gaming, if those facilities are used for dining and parking and other permitted development uses and not for

11

actual gaming.

¶24. Development use and subleasing, under paragraphs 2.1(b) and 6.1 of the Tidelands Lease, must be approved by the State. The Secretary of State contended to the trial court that his approval had never been given. However, the Resort Lease—which in no uncertain terms was for a restaurant and parking connected to a casino—preceded the Tidelands Lease. If the Secretary of State disapproved of the Resort Lease, it seems the time to express that disapproval would have been when negotiating a compromise with the City over the Tidelands in May 2011. But instead of declaring the Resort Lease violative of the Tidelands Lease, the Secretary of State agreed to the gaming-use exception in the Tidelands Lease that, by its clear terms, allows for the uses stated in the Resort Lease. More importantly, the Tidelands Lease specifically recognized the existence of the Resort Lease and the right of the City to execute partial assignments of the Tidelands Lease to provide good leasehold title. Simply stated, the Tidelands Lease between the Secretary of State and the City specifically incorporates and ratifies the Resort Lease.

¶25. The Secretary of State's argument that they must separately approve uses, which are allowed under the Tidelands Lease, for the Resort Lease that they have already recognized and acknowledged in the Tidelands Lease is unconvincing. Further, the argument that the Secretary of State has not approved the uses in the Resort Lease, thereby placing those uses in violation of the Tidelands Lease and rendering the Resort Lease a nullity is equally unpersuasive. The Secretary of State had already recognized the Resort Lease in the Tidelands Lease and agreed to allow partial assignments of the Tidelands Lease to secure

12

leasehold title.

¶26.  Had the State not leased this right away to the City (and the Resort by ratification) in 2011 through the Tidelands Lease, the State would be well within its rights as Trustee of the Tidelands to require the Resort to enter into a separate tidelands lease.  But the State did lease this right away and, further, did specifically ratify the prior Resort Lease.  The City exercised its leased right by continuing its lease with the Resort.

## CONCLUSION

¶27.  The City entered into a lease with the Resort.  The Secretary of State subsequently entered into a boundary agreement and lease with the City regarding the tidelands which, in part, allowed the City to use, and lease, the tidelands property for development uses identical to those set forth in the Resort Lease with prior approval of the Secretary of State.  The lease between the Secretary of State and the City then specifically recognized the Resort Lease and the right of the City to partially assign the lease to the Resort for the purpose of assuring good leasehold title so long as the rights conveyed were in conformity with the lease between the Secretary of State and the City.  In doing so, the Secretary of State ratified the prior lease between the City and the Resort.

¶28.  **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, BEAM, ISHEE AND GRIFFIS, JJ., CONCUR.**

13